**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| YEMIN JI, derivatively on behalf of Nominal Defendant, KVH INDUSTRIES, INC., Plaintiff, | Case No. CA 05 273T |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| MARTIN A. KITS VAN HEYNINGEN, PATRICK J. SPRATT, ROBERT W.B. KITS VAN HEYNINGEN, ARENT H. KITS VAN HEYNINGEN, MARK S. AIN, STANLEY K. HONEY, BRUCE J. RYAN, and CHARLES R. TRIMBLE, Defendants, | **<u>JURY TRIAL DEMANDED</u>** |
| and | |
| KVH INDUSTRIES, INC., Nominal Defendant. | |

Plaintiff Yemin Ji ("Plaintiff" or "Ji") files this Verified Shareholder Derivative Complaint and alleges on information and belief, except as to those allegations that pertain to Plaintiff, which are alleged on personal knowledge, as follows:

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought by a shareholder of KVH Industries, Inc. ("KVH" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of stale law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between October 1, 2003 and the

present (the "Relevant Period") and that have caused substantial losses to KVH and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331(a)(2) as a Federal question exists.

3. Also, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Director Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

4. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

5. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Director Defendants' primary participation in the wrongful acts detailed herein, occurred in this district, and KVH maintained its corporate headquarters in this District during the Relevant Period.

## THE PARTIES

6. Plaintiff Yemin Ji is, and was at all times relevant hereto, an owner and holder of KVH common stock.

7. Nominal defendant KVH is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 110 Enterprise Center, Middletown, Rhode Island.

8. Defendant Martin A. Kits van Heyningen ("M. Kits van Heyningen") is believed to be a resident of Rhode Island. At all relevant times he was the President, Chief Executive Officer ("CEO") and a director of KVH.

9. Defendant Patrick J. Spratt ("Spratt") is believed to be a resident of Rhode Island. At all relevant times he was the Chief Financial Officer of KVH.

10. Defendant Robert W.B. Kits van Heyningen ("R. Kits van Heyningen") is believed to be a resident of the State of Rhode Island. At all relevant times he was the Vice President of Research and Development and a director of KVH.

11. Defendant Arent H. Kits van Heyningen ("A. Kits van Heyningen") is believed to be a resident of the State of Rhode Island. At all relevant times he was the Chairman of the Board and a director of KVH.

12. Defendant Mark S. Ain ("Ain") is believed to be a resident of the State of Massachusetts. At all relevant times he was a director of KVH. During the Relevant Period, Ain served as a member of the Board of Director's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee.

13. Defendant Stanley K. Honey ("Honey") is believed to be a resident of the State of Illinois. At all relevant times he was a director of KVH. During the Relevant Period, Honey served as a member of the Nominating and Corporate Governance Committee.

14. Defendant Bruce J. Ryan ("Ryan") is believed to be a resident of the State of North Carolina. At all relevant times he was a director of KVH. During the Relevant Period, Ryan served as a member of the Board of Director's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee.

15. Defendant Charles R. Trimble ("Trimble") is believed to be a resident of the State of California. At all relevant times he was a director of KVH. During the Relevant Period, Trimble served as a member of the Board of Director's Audit

Committee, Compensation Committee and Nominating and Corporate Governance Committee.

16. Defendants A. Kits van Heyningen, M. Kits van Heyningen, R. Kits van Heyningen, Ain, Honey, Ryan and Trimble are referred to herein as the "Director Defendants." Defendants M. Kits van Heyningen, R. Kits van Heyningen and Spratt are referred to herein as the "Officer Defendants." Defendants R. Kits van Heyningen and Trimble are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

17. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of KVH's Quarterly Reports, press releases and presentations to Securities analysts, money and portfolios managers and institutional investors, i.e. the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those

statements where each "group published" information, the result of the collective action of the Individual Defendants.

18. Each of the above officers and directors of KVH, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

19. As officers and directors of a publicly-held company, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, as well as, present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

20. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other

communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with KVH, each of the Individual Defendants had access to the adverse, undisclosed information about KVH's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about KVH and its business issued or adopted by the Company materially false and misleading.

21. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

22. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of KVH securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding KVH's business, operations, management and the intrinsic value of KVH securities.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

23. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

24. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did (i) conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares, complete a secondary offering, and engage in insider selling; (ii) maintain the Individual Defendants' executive and directorial positions at KVH and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of KVH, regarding the Individual Defendants' management of KVH's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

25. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 1, 2003, and continuing thereafter. During this time the Individual Defendants caused the Company

to conceal the true fact that KVH was misrepresenting its financial results. In addition, defendants also made other specific, false statements about KVH's financial performance and future business prospects, as alleged herein.

26. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of KVH common stock so certain defendants could profit from their insider sales and all defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

27. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

28. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially

assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

29. KVH, founded in 1982 by defendants M. Kits van Heyningen, R. Kits van Heyningen and A. Kits van Heyningen, is a designer, manufacturer and marketer of mobile satellite communications products for the automotive/recreational vehicle/marine markets, tactical navigation, guidance and stabilization products for defense markets, and fiber optic products.

30. Prior to the start of the Relevant Period, KVH experienced significant declines in the sales of its purportedly high margin navigation products to the defense sector. The Company's future prospects were further eroded by unforeseen delays in obtaining requisite approvals and purchasing commitments for certain of KVH's defense related products, including the TACNAV M100 navigation system, among others, from appropriate military authorities. As a result, in September of 2003, KVH heavily promoted and rushed to market TracVision A5 ("A5") and G8 satellite TV ("G8") systems (collectively referred to as the "TracVision systems"), satellite communication devices that are designed for use in the automotive and marine markets. According to the Individual Defendants, KVH's newly developed TracVision systems would immediately redirect the Company's prospects upwards and carry KVH to new levels of profitability and growth in the future.

31. The TracVision systems arose from KVH's mobile broadband research initiative which commenced in late 2000, but was later abandoned in mid-2002. These systems, specifically the A5, allows users to watch satellite television from their

vehicles. KVH's introduction of the A5 came during an opportune period of "tremendous popularity" with "the backseat video entertainment market." The efendants road on the coattails of this popularity momentum to promote the A5 and its anticipated launch in the second quarter of 2003.

32. Defendants' laudatory commentary and promotion of the A5 prompted market analysis to take a closer look at the A5 and its prospective impact on the Company's financials. Indeed, a January 8, 2003 market report by Needham & Company, Inc. provides that, based on market statistics, sales of A5 could more than double KVH's reported revenue for fiscal year 2002 from all sources. Needless to say, the defendants deliberate promotion and marketing of the TracVision systems at the start of the Relevant Period conveniently overshadowed KVH's decreasing defense revenues in the first and second quarters of 2003.

33. After much self-perpetuated hype throughout the first and second quarters of 2003, the defendants caused KVH to delay its launch of the A5 from the second quarter 2003 until the third quarter of 2003. The defendants' promotion of the A5 had caused a 113% appreciation in KVH shares following the defendants' January 9, 2003 press release introducing the A5 to the public. In order to continue the hype and consequent stock appreciation during the third quarter of 2003, the defendants caused KVH to disseminate false and misleading information pertaining to the A5. This ultimately led to a Relevant Period high of $33.00 on November 25, 2003.

34. Unknown to investors, however, KVH's TracVision systems had been rushed to market in order to stem the Company's financial losses in the defense sector. The TracVision systems marketed by the Company during the Relevant Period could

not be produced in quantities or at cost levels that warranted the Individual Defendants' false and misleading statements concerning KVH's return to profitability and sustainable growth during the fiscal year 2004. Thus, in order to reach KVH's proclaimed goals, defendants caused KVH to artificially inflate its financial results by manipulating its sales numbers.

35. The Individual Defendants used various sales and accounting tactics and inducements to carry out their plan. For example, the Individual Defendants caused KVH to improperly recognize revenue from fictitious sales of the A5. It has been alleged that at the end of each quarter, verbal purchase orders, as opposed to legally executed written purchase orders, would be placed for any remaining wharehouse inventory. Upon receipt of these orders, the purported customer would refuse delivery and the "sold" product would be returned. It has also been alleged that purported sales would be recognized where products were simply removed from the wharehouse, but actually remained on the lot or were placed and held in a truck off-site. These actions caused KVH's revenues to be grossly overstaled as revenues from these fictitious sales should not have been recognized.

36. It has also been alleged that Individual Defendants caused KVH to engage in aggressive sales practices, such as channel stuffing, as evidenced by the fact that a majority of KVH's sales occurred during the last weeks or days of a period. To induce customers to heavily purchase KVH products during this critical window to ensure its guidance would be met, it has been alleged that the Individual Defendants engaged in certain side agreements, such as waiver of shipping costs which were normally paid by the customer, unconditional rights of return, lifting of credit restrictions on certain

customers to permit shipment, overriding a credit hold, authorizing shipment by COD, i.e. cash-on-delivery, and permitting price concessions on retail channel inventory. These side agreements were not reflected in either the Company or customer's records. Thus, the public and the market could not have had knowledge that KVH's reported sales revenues in actuality did not represent the actual market demand for the product.

37. It has been alleged that Individual Defendants' engagement in these improper practices reached a pinnacle during the initial launch of the A5 in the third and fourth quarters of 2003. For example, this is evidenced by KVH's increased shipping costs, which were often waived, which exceeded KVH's budget by at least $750,000.00 to $1,000,000.00 during this time period.

38. The Individual Defendants' motivation in failing to disclose adverse facts concerning its defense revenues and true facts concerning its sales of the TracVision systems was to artificially inflate KVH stock to carry out a public offering of KVH common stock to raise much needed capital. It worked. On or about February 13, 2004, the Company issued over 2.7 million shares of KVH common stock at a price of $18.75 per share, generating more than $51.5 million in proceeds.

39. On or about July 6, 2004, however, the Individual Defendants caused KVH to announce, prior to the opening of the financial markets, that it was slashing the retail price of its TracVision systems by more than 34% and taking a multi-million dollar write down of vendor purchase commitments and on-hand inventories to reflect the true value of the KVH's TracVision systems sales. The investing public was stunned. In pre-opening market trading, KVN common stock declined more than 19% to open at $9.51

per share on July 6, 2004, a 49% decline from the public offering price of $1 8.75 just 4 months prior and a more than 70% decline from the Relevant Period high of $33.00.

## MATERIAL MISSTATEMENTS

40. On October 1, 2003, the Individual Defendants caused KVH to issue a press release entitled "KVH Provides Third Quarter Update; New TracVision A5 & TracVision G8 Shipping." This release conveniently sandwiched KVH's lackluster third quarter of 2003, with KVH's purported successful launch of the TracVision systems. The release provides in pertinent part as follows:

> According to Martin Kits van Heyningen, president and chief executive officer, KVH began shipments of its new TracVision A5 satellite TV system to retailers nationwide during the last week of September. "This is a major development milestone for the company as we have successfully brought this new product to market," said Mr. Kits van Heyningen. "TracVision A5 enables KVH to enter the growing automotive multimedia market by offering live satellite TV in cars. By the end of the quarter, we shipped approximately 150 TracVision A5 units and anticipate shipping 2,000 to 3,000 units in the fourth quarter. Also at the end of September we significantly expanded our marine market coverage by shipping our new TracVision G8 satellite TV system for larger yachts and commercial vessels."
>
> Preliminary financial results indicate overall third quarter revenues were up approximately 8% to $13.4 million. Chief Financial Officer Pat Spratt said, "Our third quarter earnings per share will be in the range of breakeven to a modest loss - primarily due to lower-than-anticipated military revenues. The end-of-quarter timing of the first TracVision A5 shipments and higher-than-anticipated TracVision A5 startup expenses and initial unit production costs were also contributing factors in these financial results."
>
> * * *
>
> "In the fourth quarter, we believe that we will see strong revenue growth in the range of 30% to 50% compared with last year's fourth quarter, driven largely by sales of the Trac Vision A5 and our existing satellite products," said Mr. Spratt. "We expect our fourth quarter earnings to show only a modest profit as a result of a lower percentage of high-margin military

> products in our sales mix and the continuing high startup and early volume production costs of TracVision A5. Our profit margins should, however, begin to trend upward during the fourth quarter and into 2004 as TracVision A5 production volume increases and we benefit from our ongoing cost reduction efforts."

41. On October 2, 2003, Peter Friedland, an analyst from WR Hambrecht & Co., issued a positive report on KVH maintaining his buy rating and 12-month share price target of $24.00. Incorporating defendants' guidance on projected A5 sales and margins as reported in the Company's October 1, 2003 press release, the analyst report stated in pertinent part:

> Yesterday after the close, KVH pre-announced a Q3:03 miss due to a shortfall in defense and delayed initial shipments of the [A5], which is not surprising given that the A5 began shipping later in Q3:03 than anticipated. Management waited until the end of the quarter to pre-announce in hopes that it would receive a $1.0 MM follow-on defense order that did not materialize, though it is still in the pipeline. Q4:03 top-line guidance is very positive, as the company expects 2,000-3,000 A5 unit shipments, which makes up for the shortfall in Q3:03. While Q4:03 guidance is soft due to high A5 startup production costs, we expect margins to improve as volumes ramp. Therefore, despite the setback, we maintain our buying rate as we continue to believe the A5 has the potential to double KJH 's revenue over the next 2-3 years.

42. That same day, spurred by the Company's press release on October 1, 2003, Needham analyst, Richard Valera, issued a report reiterating his "Buy" rating on KVH common stock and maintaining a 12-month share price target of $26.00 per share. The analyst report state in pertinent part:

> With respect to KVHI's negative pre-announcement last night, the slippage of the 8 defense order and the A5 production delay (which appears to be largely resolved) do not overly concern us. And we find that company's 2,000-3,000 A5 unit estimate for the A5 encouraging in that it demonstrates solid initial demand for the A5 and some confidence on the company 's part in its ability to meet this demand.

43. On October 16, 2003, the Individual Defendants caused KVH to issue a press release entitled "KVH Industries Announces Results for the Third Quarter" which provides in pertinent part:

> KVH Industries Inc., a leading provider of mobile satellite communications products 13 and defense-related navigation and guidance systems, today reported its results for the third quarter ended September 30, 2003. Revenue for the period was $13.5 14 million, up 9% from $12.4 million for the third quarter ended September 30, 2002. Net loss for the period was ($0.16) million, or ($0.01) per share. By comparison, 15 KVH recorded a net profit of $0.15 million, or $0.01 per diluted share, during the same period last year.

In discussing KVH's third quarter, defendant M. Kits van Henyningen stated in part as follows:

> "During the third quarter, sales in our existing satellite markets were strong while our overall growth was moderate," explained Martin Kits van Heyningen, KVH's president and chief executive officer. "A delayed military order from an existing customer led to a greater-than-anticipated decline in military sales and a drop in margins and earnings. Even so, KVH strengthened its competitive and strategic position in each of its markets through new product introductions."
>
> * * *
>
> "The third quarter of this year marked a major strategic achievement for KVH as we began shipping our TracVision A5 satellite TV antenna," Mr. Kits van Heyningen said. "KVH is the first company in the world to develop, produce, and ship a low-profile in-motion phased array antenna that brings live satellite TV to consumers in SUVs and mini-vans nationwide. As the first to market, we have an excellent opportunity to secure a strong and lasting competitive position in the automotive multimedia market."
>
> * * *
>
> Mr. Kits van Heyningen concluded, "Looking ahead to the fourth quarter, I believe that we will see strong year-over-year revenue growth in the range of 30% to 50% for the quarter, driven largely by sales of the TracVision A5 and our other satellite products."

Defendant Spratt also commented on KVH's financials for 3Q:03 and said:

"The third quarter was a period of significant transition for the company. We continued to see operating improvements in our core businesses and in overall asset utilization. The low level of defense revenue and the introduction of the TracVision A5, however, presented some financial challenges. Gross margin for the quarter declined to 43%, down from 45% last year. The delayed military order and the high startup and early volume production costs for the TracVision A5 contributed to this greater-than-anticipated decline. Operating expenses, measured as a percentage 8 of quarterly revenue, rose to 45% compared to 43% in the third quarter of 2002. This reflects the effect of variable sales and marketing expenses associated with the very 9 strong satellite communications sales growth and the initial steps to launch the TracVision A5. Inventory was $2.2 million higher than at the end of the second 10 quarter of 2003 primarily to support the startup of TracVision A5 production. As a result, inventory turns were approximately six per year. Cash declined $0.8 million 11 during the quarter."

44. During a conference call with analysts, on October 16, 2003, the defendants continued to tout the successful roll-out of the A5, concluding that KVH was now well-positioned to achieve substantial revenue growth beginning in 4Q:03. As evidenced in the transcript of the conference call, which was published by Fair Disclosure Wire, defendant M. Kits van Heyningen stated in pertinent part:

[W]e succeeded and began shipping our [A5] in Q3 to our dealers throughout the country.

* * *

The initial response from dealers to consumers has also been extremely positive. We now have approximately 740 retail outlets and expect to have between 20 eight and 900 dealers by the end of the year.

* * *

By the end of Q3 we shipped approximately 150 A5 systems. As of today, we can build them at a rate of about 250 per week. The production level that we're at now enables us to produce and ship our fourth quarter target of 2,000 to 3,000 [A5] systems. So we don't have any production constraints.

* * *

> So looking ahead to Q4, I believe that we'll see strong year—over—year revenue growth in the range of3O—S0% driven largely by sales with [A5] and our other satellite products.

45. Defendant M. Kits van Heyningen discussed various issues during the Q & A with analysts, including product returns, retail sell through and incremental revenues. Defendant M. Kits van Heyningen stated that KVH had "zero returns for product issues" and only some returns for "shipping damage," which was subsequently "addressed through better packaging." M. Kits van Heyningen also stated that five million dollars in incremental revenues and "sounds about right." As to retail sell through, defendants M. Kits van Heyriingen stated, in part, as follows:

> We're starting to [get indications back from retailers], and that of course is the key question. Some of the orders we have now, the dealer might buy, say, eight pieces and what we're looking for exactly what you're asking, is are they selling through? And we've already had some reorders and people are working through their initial inventories. And that's what we're really looking for to give us better visibility going forward. At the same time, most consumers don't know about this product yet, so we haven't done any kind of national ad campaign. We've had some great PR, which has of course been free on Headline News and the Today Show, so we're starting to get the word out. But it's still a brand-new product and we're not driving people into showrooms yet, so the fact that they already have preorders and are selling the product that they have we think is a great sign. And they're confident that the product is going to sell well.

46. As to defendant M. Kits van Heyningen's statement at the conference call concerning returns due to shipping damage, it has been alleged that customers refused delivery of an estimated 90% of the initial A5s shipped during the A5 introduction into the market due to damage during shipment. Indeed, it has also been alleged that KVH nevertheless continued to ship the A5 even knowing that it would likely be returned due to damages sustained during shipment of the product to a customer. As defendant M. Kits van Heyningen knew of the defective packaging, he would have known of the actual amount of the returns making his commentary misleading. Further, as to

defendant M. Kits van Heyningen's comment that there were "zero returns for product issues," it has also been alleged that multiple units of the A5 were recalled as they could not receive Direct TV satellite broadcast programming, and thus had to be reconfigured. It has been alleged that these Units were subsequently sold as "new" even though they were reconfigured and used.

47. On or about October 17, 2003, Needham issued a positive report on KVH common stock and increased its target share price to $30.00 per share. Needham's report, influenced by M. Kits van Heyningen's statements during the October 16, 2003 conference call, stated, in pertinent part:

> Management reaffirmed its expectations of 2,000-3,000 A5 units in the 4Q:03 and suggested it was not currently production limited with a 250/week production rate. Visibility to sell-through of the initial A5 units remains limited due to the large number of retailers involved, although management stated some retailers had already placed reorders for the A5.
>
> * * *
>
> We were encouraged by the company's commentary on the call with respect to A5 margin expansion, which suggested the A5 would achieve margins equal or above the company's current satellite product margins by 2Q:04.

48. On November 4, 2003, the Individual Defendants caused the Company to issue a press release entitled "Retailers & Customers Praise New KVH TracVision A5 Satellite TV for Automobiles" which provides in pertinent part:

> The groundbreaking TracVision A5 brings satellite television to in-vehicle video screens throughout the country just as mobile video systems have become the hottest selling automotive electronic accessory on the market today. Retailers and customers alike are offering rave reviews of the TracVision A5's performance, design, and the unmatched variety of entertainment and news now available in cars via satellite.

49. Defendants' false and misleading statements caused KVH stock to rise to a high of $31.90 from opening at $29.10 on November 4, 2003. KVH stock ultimately closed at $30.55 on November 4, 2003.

50. Shortly thereafter, while KVH stock was still elevated, defendant Trimble sold 5,000 of his shares of KVH stock on November 10, 2003, for total proceeds of $143,500.00.

51. Then on November 14, 2003, the Individual Defendants caused KVH to file its third quarter in 2003 Form 10-Q with the SEC, which incorporated the Company's financial results as announced in the October 16, 2003 press release. The Form 10-Q was signed by defendant Spratt and contained the following representations as to KVH's revenue recognition policies:

> Revenue from product sales is recognized when requested goods are shipped, title has passed [and] collectibility is reasonably assured. Revenue from services other than under long-term development contracts is recognized when completed services are provided to the customer. Management establishes reserves for potential sales returns and evaluates, on a monthly basis, the adequacy of those reserves based upon realized experience.
>
> * * *
>
> Inventory is valued at the lower of cost or market. We regularly review current quantities on hand, actual and projected sales volumes and anticipated selling prices on products and write down slow-moving and/or obsolete inventory to its net realizable value. Generally, our inventory does not become obsolete because the materials we use are typically interchangeable among various product offerings. If we overestimate projected sales or anticipated selling prices, our inventory might be overvalued and we would have to reduce our inventory valuation accordingly.

The Form 10-Q further represented that the financial statements presented therein were prepared in conformity with GAAP, stating in pertinent part:

> The Condensed Consolidated Financial Statements have not been audited by independent public accountants, but include all adjustments (consisting only of normal recurring adjustments) which are, in the opinion of management, necessary for a fair presentation of the financial condition, results of operations, and cash flows for the periods presented.

52. On the day KVH filed its Form 10-Q for the third quarter of 2003 with the SEC. KVH stock rose to $30.10. Just three days later on November 17, 2003, defendant R. Kits van Heyningen sold 27,326 of his KVH stock at approximately $29.00 per share for total proceeds of $503,219.00.

53. On January 6, 2004, following KVH's "update" of its preliminary fourth quarter of 2003 financial results, the Individual Defendants caused the Company to issue a press release entitled "KVH Provides Fourth Quarter Update." The press release stated in pertinent part:

> [P]reliminary, unaudited results suggest that the company will report record quarterly revenues of approximately $15 .6-$ 15.9 million and a fourth quarter net loss in the range of ($0.11 )-($0.14) per share. This would represent approximately a 20% increase over the fourth quarter 2002 reported revenue of thirteen million dollars.
>
> * * *
>
> Commenting on the new TracVision A5 satellite TV system for automobiles, KVH President and Chief Executive Officer Martin Kits van Heyningen said, "The fourth quarter marked the first full quarter of TracVision A5 sales and shipments and during that period we shipped approximately 1,700 TracVision A5 units, which represents roughly 30% of our total estimated satellite communications revenue for the quarter. Already, the TracVision A5 satellite TV system for automobiles has proven to be the most successful product launch and fastest sales ramp of any product in the company's history."
>
> The number of TracVision A5 units shipped was lower than we had 21 anticipated due in part to production delays resulting from component supply issues early in the quarter," continued Mr. Kits van Heyningen. "However, I believe those issues have been addressed. Our Trac Vision A5 cost reduction program is on track and we began to see the gross profit benefit on a per-unit basis at the end of the quarter. All other aspects of the TracVision A5 program, including sales, marketing, distribution, and

> the expansion of our retailer network, remain on track. Based on the continued market interest and positive, direct consumer feedback from new TracVision A5 owners, we are confident that the TracVision A5 will help drive our future growth and profitability."

54. Unbeknownst to the public, as has been alleged, 17% of the 1,700 A5 units sold in the fourth quarter of 2003 were returned to KVH early during the first quarter of 2004, because the alleged customer had never actually ordered the products. Indeed, it has been alleged that there were often no purchase orders, only verbal orders and undisclosed agreement as to sales terms. As has been alleged, during the fourth quarter of 2003, multiple truckloads of product were shipped to customers who refused to take delivery and subsequently returned the product. The returned products would sit for about six weeks in a trailer and then would be returned to active inventory. Typically, as has been alleged, returned inventory would reenter the market within several days, but the Individual Defendants here, allowed longer periods to manipulate KVH's financials. As has been alleged, these purported shipping orders without formal purchase orders were quite common during the last week of a quarter. It has been alleged that an inventory count would be conducted at the end of each quarter, and later that day, there would be a corresponding "order" for the same amount of inventory on hand. As has been alleged, trailers would either merely remove the contents from the warehouse and allow the product to sit in the wharehouse yard, or the trailer would merely hold the product off premises. For these reasons, Individual Defendants' statements as to KVH's revenues for the fourth quarter of 2003 were misleading.

55. On or about February 13, 2004, the Individual Defendants caused KVH to complete an underwritten public offering of 2,750,000 shares of KVH common stock at $18.75 per share generating more than $51.5 million in proceeds (the "Offering"). In

connection with the Offering, KVH prepared and filed with the SEC a registration statement (the "Registration Statement") which incorporated a prospectus (collectively, the "Prospectus"). The Registration Statement, signed by defendants M. Kits van Heyningen and Spratt was declared effective on or about February 10, 2004. The Prospectus included the following statements, which were materially false and misleading for several reasons as detailed below:

> In September 2003, we introduced our TracVision A5 low-profile antenna system, which uses our hybrid phased-array antenna technology to provide in-motion satellite TV reception throughout the continental United States in minivans, SUVs and other passenger vehicles using the DIRECTV service. The product of almost three years of research and development, our TracVision A5 is the first commercially available mobile satellite TV antenna to offer a combination of price, size and performance that makes it practical for use on minivans, SUVs and other passenger vehicles. We intend to use the TracVision A5 to capitalize on the growing number of video entertainment systems found in these vehicles and the increasing demand for live content.
>
> * * *
>
> We have successfully used our engineering expertise to achieve ongoing improvements in performance amid reductions in the size and cost of our products. We utilized our experience in the development of in-motion satellite tracking antennas for the marine and land mobile markets to develop our TracVision A5 product, the first commercially available low-profile mobile satellite TV antenna for the automotive market. Similarly, we used our extensive experience in fiber optic gyro technology to develop our DSP-3000 product, a new tactical-grade gyroscope that is substantially smaller than any of our prior fiber optic gyro products. We also plan to continue to devote our engineering resources to achieving additional cost reductions in our products, which we believe will enable us to offer our products to larger numbers of consumers at lower prices.

56. On or about February 19, 2004, the Individual Defendants caused KVH to report its financial results for the fourth quarter and year ended December 31, 2003. The Company reported revenue for the fourth quarter was $15.7 million, up 21% from $13.0 million for the fourth quarter ended December 31, 2002. Net loss for the period

was $1.6 million, or $0.14 per share compared to net income of $0.3 million, or $0.03 per share, during the same period last year. The results for the fourth quarter ended December 31, 2003, were in line with the preliminary quarterly results provided by KVH on or about January 6, 2004. Defendants M. Kits van Heyningen and Spratt commented on the Company's operations, stating in pertinent part as follows:

> "In addition to 50% growth in the marine and RV markets, we also experienced a very positive introduction of the TracVision A5 into the automotive marketplace as we shipped approximately 1,700 units by the end of the year," continued Mr. Kits van Heyningen. "We fulfilled the channel backlog that had grown during the first three quarters of 2003 in anticipation of the TracVision A5 introduction. Sales of that product represented roughly 28% of our satellite communication revenue for the quarter, making the TracVision A5 new product launch the most successful in KVH history. We are now focusing our attention on activities that will create broad consumer awareness and support the sell-through in the channel. We are initiating new marketing campaigns, broadening our sales network among car dealerships, exploring partnerships with consumer electronics manufacturers to expand our reach into the mass market, and continuing to develop the potential for the future OEM in-vehicle installation of the product."

* * *

> With regard to the company's financial results Pat Spratt ... said, "In the fourth quarter we experienced two operational challenges that were the primary contributors to our weak bottom line results. These were the absence of a large anticipated defense order and the high initial production cost for the TracVision A5. Gross margin for the quarter declined to 29% from 46% in the fourth quarter of 2002. As we exited the fourth quarter the TracVision A5 product cost had been reduced and we anticipate additional improvement by mid-2004. We have continued to focus attention on managing operating expenses in relation to revenue growth and we are pleased with the continued improvement in this area."

57. On March 15, 2004, the Individual Defendants caused KVH to file its annual report on Form 10-K for fiscal year 2003. The Form 10-K was signed by all defendants and incorporated the Company's previously announced financial results and

included representations concerning KVH's accounting policies for revenues and inventories.

58. On or about April 22, 2004, the Individual Defendants caused KVH to report its financial results for the first quarter ended March 31, 2004. The Company reported revenue for the first quarter was $18.0 million, up 37% from $13.1 million for the quarter ended March 31, 2003. According to the Company, net income for the current quarter was $0.1 million, or $0.01 per share compared to net income of $0.2 million, or $0.02 per share, during the same period last year. Defendants M. Kits van Heyningen and Spratt commented on the Company's purported return to profitability, stating in pertinent part as follows:

> "We're off to a strong start this year with excellent growth in our satellite communications business, which helped us post quarterly revenues that broke our previous record by more than $2 million. We also executed a $1.75 million sequential improvement on the bottom line as we achieved our immediate objective of returning to profitability," said Martin Kits van Heyningen, KVH's president and chief executive officer.
>
> * * *
>
> Reviewing the status of the company's TracVision A5 low-profile satellite TV system, Mr. Kits van Heyningen explained, "As planned, in the first quarter we largely focused on developing market awareness and consumer pull through our marketing and dealer training programs. These efforts helped support our retailers' sell-through of TracVision A5 inventory already in the sales channel. New sales to retailers were lower than in Q4 as that initial channel fill was consumed. Our recent informal channel checks suggest that there is only limited inventory in the retail channel and we anticipate seeing reorders from the dealer network during the second quarter...."
>
> * * *
>
> With regard to the company's financial results Pat Spratt ... said, "The first quarter was highlighted by our continued growth, achieving record quarterly revenue, and strong sequential improvement on the bottom line from the fourth quarter of 2003. We benefited from continuing product cost improvement efforts, including progress with regard to the TracVision A5.

> At 39%, overall gross margin reflected a solid 10-percentage point improvement compared to the fourth quarter of 2003. This is, however, still below the gross margin in the first quarter of 2003 when the product mix consisted of a much larger percentage of military products."

**THE TRUTH IS REVEALED**

59. On or about July 6, 2004, prior to the market's opening, KVH's problems became known to the public when the Individual Defendants caused the Company to issue a press release announcing its preliminary second quarter of 2004 financial results. KVH reported that its revenues had significantly declined, both sequentially and when compared to the same period last year. The Company reported that it expected second quarter revenues to be $14.2 million to $14.5 million a decline of more than 19% compared to the first quarter. The Individual Defendants also revealed that KVH was being forced to slash the price of its TracVision systems by more than 34% and write-down channel and stock inventories of the systems by at least $2.5 million. As a result the Company was expected to report a loss for the second quarter of 2004 of at least $4.9 million or $(0.34) per share. The press release stated in relevant part:

> "Preliminary financial results indicate that our overall second quarter revenues will be between $14.2 million and $14.5 million, well below our original expectations for the quarter. This was primarily due to lower than expected sales for our military navigation products and land mobile satellite systems," remarked Pat Spratt, KVH's chief financial officer. "On the other hand, the continued success of our aggressive manufacturing cost reduction efforts for the TracVision A5 is enabling us to now offer this product with a suggested retail price of $2,295, reduced from $3,495. By offering the TracVision A5 at a lower price point, we hope to substantially broaden the market for this product while maintaining reasonable margins. Our existing inventory and vendor purchase commitments have been revalued to reflect the new sales price and reduced go-forward production costs. As a result of the combination of revenues that were below expectation and the approximately $2.5 million inventory valuation reserves, we anticipate recording a net loss of ($0.34) to ($0.37) per share or $4.9 million to $5.3 million for the quarter."

60. Market reaction to defendants' belated disclosures was swifi and severe. On July 6, 2004, the price of KVH common shares fell more than 24%, opening at $9.51 per share, off nearly $3.00 per share form the previous close of $12.50 per share on July 2, 2004 and a 49% decline from the public offering price of $18.75 just 4 months prior, and more than a 70% decline from the Relevant Period high of $33.

61. On July 22, 2004, the Individual Defendants caused the Company to issue a press release entitled "KVH Industries Announces Results for the Second Quarter." The press release stated in relevant part:

> Revenue for the period was $14.5 million, up 1% from $14.4 million for the second quarter ended June 30, 2003. Net loss for the period was ($4.9) million, or ($0.34) per share. By comparison, KVH recorded net income of $0.4 million, or $0.04 per share for the same period last year.
>
> For the six months ended June 30, 2004, revenue increased 18% to $32.5 million from $27.5 million for the six months ended June 30, 2003. KVH reported a net loss of ($4.8) million or ($0.35) per share for the 2004 period, versus a net profit of $0.6 million or $0.05 per share in the year ago period.
>
> * * *
>
> "As we noted earlier, our results for the second quarter were significantly lower than our expectations. We believe this is due to an unusual convergence of factors," said Martin Kits van Heyningen, KVH's president and chief executive officer. "These included a channel inventory adjustment by one of our major RV customers, potential key military programs where purchasing decisions have been delayed, and fiber optic product orders that were rescheduled for the third quarter rather than in the second."
>
> "We have made significant progress in our efforts to strengthen the market position and sales ramp for the TracVision A5, our low-profile satellite TV antenna for automobiles. Thanks to a successful and aggressive cost reduction program, we were able to reduce the suggested retail price for the TracVision A5 from $3,495 to $2,295. Our TracVision A5 cost reduction program involves both changes in component design and the use of new materials and manufacturing processes. We expect that our new pricing will help greatly in expanding the market for this innovative product."

* * *

> Defense revenue, which includes the company's tactical navigation and fiber optic product lines, was approximately $1.9 million for the second quarter, a 56% decline from the second quarter of 2003. For the year to date, defense revenue was down 41% compared to the first six months of 2003, which included sales that supported the ramp up for the war in Iraq.

* * *

> With regard to the company's financial results, Pat Spratt, KVH's chief financial officer, said, "The second quarter financial result was disappointing. We are dealing with several coil current business challenges - the uncertainties and investment demands of introducing the TracVision A5, a nominal defense backlog for near-term shipments, and dynamic channel inventory adjustments by one of our largest RV partners. We will continue to aggressively follow through on our strategic plans, but we are also taking action to improve near-term financial performance and predictability. The TracVision A5 price reduction is an important step that we have just taken to enhance market penetration and drive positive longer-term results. As a result of this price reduction, our existing inventory and vendor purchase commitments have been adjusted to net realizable value. This revaluation contributed roughly $2.4 million to the quarterly loss."

> "We do not see any fundamental weakness in the business or in the demand for our products going forward," Mr. Kits van Heyningen concluded. "We continue to be encouraged by the potential opportunities for sustained growth in our mobile satellite communications business, with both government and commercial customers for our defense navigation and guidance products, and the progress we have made in strengthening the position of the TracVision A5 in the marketplace. We are committed to restoring the company to profitability, increasing shareholder value, and, with the contributions from each of our core businesses, continuing growth. I believe that the milestones we have reached in recent months and the steps we are now taking will enable us to achieve those goals."

62. Then on August 6, 2004, the Individual Defendants caused KVH to file its Form 10-Q for the second quarter of 2004 with the SEC, which incorporated the Company's financial results as announced in the July 22, 2004 press release. The Form 10-Q was signed by defendant Spratt and contained the following representations as to KVH's revenue recognition policies:

Revenue from product sales is recognized when persuasive evidence of an arrangement exists, goods are shipped, title and risk of loss have passed and collectibiity is reasonably assured. We establish reserves for potential sales returns and allowances, and evaluate, on a monthly basis, the adequacy of those reserves based upon historical experience and our expectations for future returns.

* * *

Inventory is valued at the lower of cost or market. We regularly review current inventory quantities on hand, actual and projected sales volumes, as well as current and anticipated selling prices of our products. Where there is evidence that the utility of goods, in their distribution in the ordinary course of business, will be less than the recorded cost, whether due to competitive pricing pressures, implemented or anticipated strategic price reduction initiatives, physical deterioration, obsolescence, or other causes, the difference is recognized as a loss in the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market. Carrying values of any products or inventory components identified as having costs in excess of market are reduced by such amounts to ensure net capitalized costs do not exceed the net realizable value.

* * *

Generally, our inventory does not become obsolete because the materials we use are typically interchangeable among various product offerings. If we overestimate projected sales or anticipated selling prices, our inventory might be overvalued, and we would have to reduce our inventory valuation accordingly.

63. On October 21, 2004, the Individual Defendants caused the Company to issue a press release entitled "KVH Industries Announces Results for the Third Quarter of 2004." The release stated in relevant part:

Revenue for the period was $13.8 million, up 2% from $13.5 million for the third quarter ended September 30, 2003. Net loss for the period was ($1.6) million, or ($0.11) per share. By comparison, KVH recorded a net loss of ($0.47) million, or ($0.04) per share for the same period last year.

* * *

"We entered the third quarter with aggressive objectives for improvements in cost controls, asset management, and operational efficiency," said Martin Kits van Heyningen, KVH's president and chief executive officer.

"Despite the only modest growth in revenue, the new measures we put in place lo reduce our operating costs showed meaningful benefit. We met our goals on the bottom line and achieved or bettered our targets in several operational areas."

The company's mobile satellite communications revenue was up 12% in the third quarter of 2.004 to $10.3 million compared to the same period in 2003, driven by solid growth in sales to the domestic and European marine markets. Year-to-date. mobile satellite communications revenue was up 40% compared to the first nine months of 2003.

Looking at the results for the satellite communications business, Mr. Kits van Heyningen said, "Our quarterly satellite sales growth was driven in large part by sales of our marine satellite products, which were up 19% year-over-year. However, we believe that the hurricanes that passed through Florida and the southeastern United States in August and September did have a negative impact on our overall satellite revenues for the quarter. Year-to-date, Florida alone has represented more than 25% of our North American marine product sales and approximately 10% of sales to the RV and automotive markets. We expect that the effects of these storms will extend into the fourth quarter as recovery efforts continue in the region."

"Sales of land-based satellite communications products for the quarter increased 3% compared to the same period in 2003. Year-to-date, land-based sales are up 34% compared to the first nine months of 2003. Sales to the R V industry have been dampened somewhat during the past two quarters as one of our largest customers continues its significant company-wide reduction of inventory on hand for all of its retail products. However, sell-through of its TracVision inventory has exceeded last year's levels, indicative of continued strong consumer demand. Within the automotive marketplace, we have seen a continuation of encouraging trends for sales of the TracVision A5 satellite T\ system. Dealer feedback and an increasing sales trend indicate that the price reduction that took effect in July and the expanded advertising campaign have been beneficial...."

Defense revenue, which includes the company's tactical navigation and fiber optic product lines, was approximately $3.0 million for the third quarter, a 20% decline from the third quarter of 2003 but a 60% sequential increase over the second quarter of 2004. Year to date, defense revenue was down 35% compared to the first nine months of 2003, which included sales that supported the ramp up for the war in Iraq.

* * *

> With regard to the company's financial results, Pat Spratt, KVH's chief financial officer, said, "Improved asset management, tighter cost controls, and overall operational enhancements all played a part in the improvement of our results compared to the second quarter of 2004. These improvements included a $0.6 million sequential reduction in operating expenses, a $2.5 million sequential reduction in inventory, and a $1.5 million sequential decrease in accounts receivable. Our product mix included a greater percentage of defense products, which contributed to an improvement in gross margin on a sequential basis."
>
> Commenting on the company's expectations for the remainder of the year, Mr. Spratt said, "Looking ahead to the fourth quarter, we ... will continue to invest aggressively to expand the market awareness for the TracVision A5, but we will also tightly control other operating expenses."
>
> "We're committed to restoring the company to profitability and continuing our growth," Mr. Kits van Heyningen concluded. "During the third quarter, we saw good trends in key business areas, our operational model improved, and we increased our backlog of orders for defense products. We are continuing to build a strong foundation for more consistent performance in the coming quarters. I believe that we're on the right path and that our long-term strategy is sound."

64. On November 9, 2004, the Individual Defendants caused KVH to file its third quarter of 2004 Form 10-Q with the SEC, which incorporated the Company's financial results as announced in the October 21, 2004, press release. The Form 10-Q was signed by defendant Spratt and contained the following representations as to KVH's revenue recognition policies:

> Revenue from product sales is recognized when persuasive evidence of au arrangement exists, goods are shipped, title and risk of loss have passed and collectibility is reasonably assured. We establish reserves for potential sales returns and allowances, and evaluate, on a monthly basis, the adequacy of those reserves based upon historical experience and our expectations for future returns.
>
> * * *
>
> Inventory is valued at the lower of cost or market. We regularly review current inventory quantities on hand, actual and projected sales volumes, as well as current and anticipated selling prices of our products. Where there is evidence that the utility of goods, in their distribution in the ordinary course of business, will be less than the recorded cost, whether

due to competitive pricing pressures, implemented or anticipated strategic price reduction initiatives, physical deterioration, obsolescence, or other causes, the difference is recognized as a loss in the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market. Carrying values of any products or inventory components identified as having costs in excess of market are reduced by such amounts to ensure net capitalized costs do not exceed the net realizable value.

* * *

Generally, our inventory does not become obsolete because the materials we use are typically interchangeable among various product offerings. Lf we overestimate projected sales or anticipated selling prices, our inventory might be overvalued, and we would have to reduce our inventory valuation accordingly.

## REASONS THE STATEMENTS WERE FALSE

65. The statements referenced above were each materially false and misleading when made because they incorporated financial results fabricated by accounting gimmicks and failed to disclose certain existing material facts. During the Relevant Period, the Individual Defendants improperly recognized revenues from purported sales of KVH's TracVision systems, specifically the A5. The Individual Defendants boosted the sales of the Company by recognizing revenue on fictitious sales and by engaging in aggressive sales practices such as channel stuffing. By using such tactics, the Individual Defendants were able to maintain the appearance of great market demand and also inflate KVH stock.

66. The Individual Defendants' statements regarding the Company's revenue recognition and inventory policies were false and misleading as the Individual Defendants failed to actually adhere to those policies and thus violated GAAP. For example, the Individual Defendants allowed the Company to assert that "[r]evenue from product sales is recognized when persuasive evidence of an arrangement exists, goods

are shipped, title and risk of loss have passed and collectibility is reasonably assured." It has been alleged, however, that the Company recognized revenue from bogus sales at the direction of the Individual Defendants. If a sale is contrived, revenue surely cannot be recognized as an "arrangement" does not exist, and "title and risk of loss" have not passed. Moreover, as has been alleged, many of the purported "sales" were not supported by written purchase orders during fourth quarter of 2003, therefore, there is no documentation that an "arrangement" existed. Also, Individual Defendants violated GAAP by recognizing revenue that was not reasonably assured from sales to non-creditworthy persons whose credit hold was overridden; by recognizing revenue from defective product sales; and by recognizing revenue on sales without a reasonable estimate of product returns prior to the expiration of the return right. Individual Defendants, especially Ain, Ryan and Trimble who serve as members of the Audit Committee, should not only have known KVH's policies and GAAP, but also the Company's actual practices.

67. While disseminating false and misleading statements discussed above, the Individual Defendants knew but failed to disclose that:

a. prior to the Secondary Offering on or about February 13, 2004, the Individual Defendants caused the Company to artificially inflate its revenues and earnings by stuffing the retail channels with overpriced TracVision systems. Subsequently, the Company was forced to slash the suggested retail price of its TracVision systems by more than 34% and to effectively refund millions of dollars in purported sales revenues to its retail

dealers in the form "vendor purchase commitment" charges in order to promote sell-through of TracVision retail channel inventory;

b. the Company's revenues were not growing by millions of dollars per quarter and the purported growth trends in the Company's revenues could not be sustained;

c. KVH's retail marketing and sales programs purportedly aimed at the sell through market for the Company's TracVision systems were not performing to expectations and were causing the Company to incur additional expenses and higher losses as inventories of unsold TracVision systems in the retail channels continued to grow throughout the Relevant Period;

d. KVH had not realized any material cost reduction in the manufacture of its TracVision systems and would be forced to write-down its inventory of manufactured goods by millions of dollars; and

e. based on the foregoing, the Individual Defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

68. As a result of the Individual Defendants' actions, KVH's market capitalization has been damaged by over fifteen million dollars, and the Insider Selling Defendants were able to pocket $646,719.06 during the Relevant Period.

**ILLEGAL INSIDER SELLING**

69. During the Relevant Period, the Insider Selling Defendants sold their KVH stock while in possession of material adverse information as follows:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Robert W. B. Kits Van Heyningen | 11/17/2003 | 4575 | $29.00 | $132,675.00 |
| | 11/17/2003 | 12751 | $29.00 | $370,544.06 |
| | Sub-Total | 17326 | | $503,219.06 |
| Charles R. Trimble | 11/10/2003 | 5000 | $28.70 | $143,500.00 |
| | | 5000 | | $143,500.00 |
| | **TOTAL** | | | **$646,719.06** |

70. The Insider Selling Defendants' insider sales during the Relevant Period are suspicious as the majority of them occurred during the fourth quarter of 2003 at the peak of Individual Defendants' improper actions concerning TracVision systems and following artificially favorable press releases. The Insider Selling Defendants' insider sales during the Relevant Period are also suspicious as defendant Trimble did not even sell any of his shares in the preceding year and because R. Kits van Heyningen had only previously sold in December 2002 and June 2003.

71. These insider sales were a clear violation of the Company's Code of Ethics which "applies to the employees, officers and directors, and consultants" of the Company. Specifically, the Company's Code provides that a "conflict of interest' exists when a person's private interest interferes in any way with the interests of the Company," such as the receipt of "improper personal benefits as a result of his or her position in the Company." Indeed, section ten of the Code is specifically devoted to insider trading and states, in relevant part, as follows:

> Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit ... is not only unethical but also illegal and subject to possible civil and criminal penalties.

Despite the clear guidance and applicability on the Insider Selling Defendants generated by this Code, R. Kits van Heyningen and Trimble breached their fiduciary duties to comply with the Code by selling a total of 22,326 shares of their KVH stock for total proceeds of $646,719.06 while in possession of confidential information as discussed above.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

72. Plaintiff brings this action derivatively in the right and for the benefit of KVHI to redress injuries suffered and to be suffered by KVHI as a result of the breaches of fiduciary duty by the Individual Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

73. Plaintiff will adequately and fairly represent the interests of KVHI and its shareholders in enforcing and prosecuting its rights.

74. Plaintiff is an owner of KVHI common stock and was an owner of KVHI common stock at all times relevant to the Defendants' wrongful course of conduct alleged herein.

75. KVHI's Board of Directors is currently composed of seven (7) directors – Defendants A. Kits van Heyningen, M. Kits van Heyningen, R. Kits van Heyningen, Ain, Honey, Ryan and Trimble.

76. Defendant A. Kits van Heyningen has served as the Chairman of the Board of Directors since 1982. Defendant A. Kits van Heyningen is also a founder of the company and from 1982 he has served as the Company's chief scientist. The Company considers A. Kits van Heyningen an insider. A. Kits van Heyningen is the father of Director Defendants M. Kits van Heyningen and R. Kits van Heyningen.

77. Defendant M. Kits van Heyningen has been on the Board of Directors since 1982. Defendant M. Kits van Heyningen is also a founder of the company and from 1982 he has served as the Company's President. Additionally, He has served as

the Company's Chief Executive Officer since 1990. The Company considers M. Kits van Heyningen an insider. M. Kits van Heyningen is the son of Director Defendant A. Kits van Heyningen and the brother of Director Defendant R. Kits van Heyningen.

78. Defendant R. Kits van Heyningen has been a member of the Board of Directors since 1982. He is also a founder of the Company and has served as the vice president of research and development since April 1998. From 1982 to April 1998, he served as the vice president of engineering. The Company considers M. Kits van Heyningen an insider. R. Kits van Heyningen is the son of Director Defendant A. Kits van Heyningen and the brother of Director Defendant M. Kits van Heyningen.

79. Defendant Ain has served on the Board of the Company since 1997.

80. Defendant Honey has served on the Board of the Company since 1997.

81. Defendant Ryan has served on the Board of the Company since July 2003.

82. Defendant Trimble has served on the Board of the Company since 1999.

83. As a result of the facts set forth herein, Plaintiff has not made any demand on KVHI's Board of Directors to institute this action against the Director Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the additional following reasons:

a. During the Relevant Period, Defendants A. Kits van Heyningen, M. Kits van Heyningen and R. Kits van Heyningen were considered insiders because of their current and past positions with the Company. Further, the Company considers these individuals insiders in relation to the NASDAQ standards. As such, demand on Defendants A. Kits van Heyningen, M. Kits van Heyningen and R. Kits van Heyningen is futile;

b. A. Kits van Heyningen is the father of Director Defendants M. Kits van Heyningen and R. Kits van Heyningen. Because of this familial relationship, it is reasonable to conclude that these individuals would not sue each other. As such, demand on them is futile;

c. Prior to founding the Company, Defendants A. Kits van Heyningen and R. Kits van Heyningen both were engineers at the Submarine Signal Division of Raytheon Company. Because of this long-time working relationship, it is reasonable to conclude that A. Kits van Heyningen and R. Kits van Heyningen would not sue each other. As such, demand on them is futile;

d. Together, Defendants A. Kits van Heyningen and M. Kits van Heyningen are the beneficial owners of 6.9 percent of the Company's common stock. This percentage of stock ownership, together with the fact that three members of the seven-person Board of Directors are related, makes is extremely likely that Defendants A. Kits van Heyningen, M. Kits van Heyningen and R. Kits van Heyningen so dominate the Board of Directors that the remaining members of the Board are indebted to them for their position on the board and therefore would not sue them. As such, demand on Ain, Honey, Ryan and Trimble is futile.

e. A majority of KVH's Board of Directors and senior management participated in the wrongs complained of herein. KVH's directors are not disinterested or independent due to the following: Director Defendants served on the Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the Director Defendants breached the fiduciary duties that they owed to KVH and its shareholders in that they failed to prevent and correct material misrepresentations made by the Company. Further, the Director Defendants are not independent because of their stake in the financial performance of the Company;

f. The Director Defendants of KVH, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from KVH's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

g. In order to bring this suit, a majority of the Directors of KVH would be forced to sue themselves and persons with whom they have extensive

business and personal entanglements, which they will not do, thereby excusing demand;

h. The acts complained of constitute violations of the fiduciary duties owed by KVH's officers and directors and these acts are incapable of ratification;

i. Any suit by the current directors of KVH to remedy these wrongs would likely expose the Individual and Director Defendants, and KVH, to additional liability for violations of the securities laws that would result in civil actions being filed against the Individual and Director Defendants. M. Kits van Heyningen is presently a Defendant in securities class action lawsuits; thus, he is hopelessly conflicted in making any supposedly independent determination whether to sue himself;

j. KVH has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for KVH any part of the damages KVH suffered and will suffer thereby;

k. If the current Directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual and Director Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

l. If KVH's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of KVH. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, it is believed that the directors' and officers' liability insurance policies covering the Individual and Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by KVH against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of KVH, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a

suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause KVH to sue them, since they will face a large uninsured liability.

m. During the Relevant Period, R. Kits van Heyningen sold 17,326 shares of KVH stock for proceeds of $503,219.06 and Trimble sold 5,000 shares of KVH stock for proceeds of $143,500. As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors, each of the defendants knew the adverse non-public information that was materially different than existed in the marketplace regarding KVH's revenues for its TracVision systems, specifically the A5. Specifically, the Insider Selling Defendants knew that KVH was engaging in fictitious sales and aggressive sales tactics such as channel stuffing to artificially inflate its sales and revenues. Because of these insider sales, it is reasonable to conclude that R. Kits van Heyningen and Trimble would not sue each other or initiate an action. As such, demand on them futile;

n. According to KVH's Proxy Statement filed with the SEC on or about April 22,2004, defendants Ain, Ryan and Trimble were, during the Relevant Period, members of the Audit Committee and would have convened at least quarterly to discuss KVH's financials. The Audit Committee has the responsibility to monitor and review the financial reporting process, including the system of internal controls and the preparation of the Company's financial statements in accordance with GAAP. According to KVH's Charter for the Audit Committee of the Board of Directors in effect during the Relevant Period, the Audit Committee is charged with assisting the Board in overseeing the integrity of the Company's financial statements, the compliance with legal and regulatory requirements, the independent auditor's qualifications and independence and the performance of the Company's independent auditors. Specifically, the Audit Committee is also responsible for: (i) regular reporting to the Board of Directors regarding the audit committee's activities; (ii) reporting to the Board of Directors the results of its evaluation of the qualifications, performance and independence of the Company's independent auditor; (iii) determining whether the members of the Audit Committee shall receive special compensation for their service on the Audit Committee, which may take the form of cash, stock, stock options or other in kind consideration ordinarily available to directors; (iv) annually reviewing the qualifications and performance of the independent auditor; (v) preparing an annual report to the stockholders for inclusion in the Company's proxy statement relating to the annual meeting of stockholders; (vi) reviewing and discussing with management and the company's independent auditor, the Company's financial statements and other financial disclosures prior

to public distribution, and in particular, the Audit committee shall, to the extent it deems necessary or appropriate review and discuss with management and the company's independent auditor. **Moreover, pursuant to the Company's Code of Ethics, the Company's "books, records, accounts and financial statements must be maintained in reasonable detail,... reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls."** Nonetheless, during the Relevant Period, the Audit Committee recommended that the Board of Directors include the financial forecasts and disclosures contained in the numerous press releases and quarterly reports filed with the SEC during the Relevant Period. It is consistent with the Audit Committee's duties and obligations to review defense revenues, revenues generated by the A5, inventory of the A5, and any corresponding returns of such product which would impact KVH's financials and ensure the proper reporting of such information in accordance with GAAP. Thus, the Audit Committee would have known of the truth of the A5 and the reasons for its hasty release. By nevertheless disseminating false information, defendants Ain, Ryan and Trimble breached their duties by causing or allowing the improper financials and public disclosures. By such actions, defendants Ain, Ryan and Trimble chose to breach their fiduciary duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

84. Plaintiff has not made any demand on the shareholders of KVH to institute this action since demand would be a futile and useless act for the following reasons:

a. KVH is a publicly held company with approximately 14.5 million shares outstanding, and thousands of shareholders;

b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c. Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

85. KVH has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

a. Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b. Costs and legal fees for defending KVHI and the Individual Defendants against private class action litigation arising from illegal and improper conduct alleged herein.

**FIRST CAUSE OF ACTION**

**Against Individual Defendants**
**for Breach of Fiduciary Duty**

86. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through eighty-five (85) above as set forth fully herein.

87. The Individual Defendants owed and owe KVH fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe KVH the highest obligation of good faith, fair dealing, loyalty and due care.

88. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

89. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition and business prospects of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

90. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, KVH has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91. Plaintiff, on behalf of KVH, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Against The Individaul Defendants**
**<u>for Abuse of Control</u>**

92. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through ninety-one (91) above as set forth fully herein.

93. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence KVH, for which they are legally responsible.

94. As a direct and proximate result of the Individual Defendants' abuse of control, KVH has sustained significant damages.

95. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96. Plaintiff, on behalf of KVH, has no adequate remedy at law.

**THIRD CAUSE OF ACTION**

**Against The Individual Defendants**
**<u>for Gross Mismanagement</u>**

97. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through ninety-six (96) above as set forth fully herein.

98. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of KVH in a manner consistent with the operations of a publicly held corporation.

99. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, KVH has sustained significant damages in excess of millions of dollars.

100. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

101. Plaintiff, on behalf of KVH, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Against The Individual Defendants**
**for Waste of Corporate Assets**

102. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred one (101) above as set forth fully herein.

103. As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused KVH to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

104. As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

105. Plaintiff, on behalf of KVH, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**

**Against The Director Defendants**
**for Unjust Enrichment**

106. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred five (105) above as set forth fully herein.

107. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of KVH.

108. Plaintiff, as shareholder and representative of KVH, seeks restitution from the Dire Individual ctor Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

**SIXTH CAUSE OF ACTION**

**Against Officer Defendants**
**Pursuant to 15 U.S.C. §7243 (SARBANES-OXLEY ACT)**

109. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred eight (108) above as set forth fully herein.

110. Based upon the allegations made above and pursuant to 15 U.S.C. §7243, KVH is entitled to reimbursement of all bonuses and other incentive-based or equity-based compensation paid to Officer Defendants, as well as any profits realized from the sale of KVH securities by them.

**SEVENTH CAUSE OF ACTION**

**Against The Insider Selling Defendants for**
**Breach of Fiduciary Duties, for Insider Selling**
**and for Misappropriation of Information**

111. Plaintiff incorporates by reference and realleges each and every allegation set forth in paragraphs one (1) through one hundred ten (110) above, the same as set forth fully herein.

112. At the time of the stock sales set forth herein by the Insider Selling Defendants, they knew the information described above and sold KVH common stock on the basis of such information.

113. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold KVH common stock.

114. The Insider Selling Defendants' sale of KVH common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

115. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual

Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C. Awarding to KVH restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

## VERIFICATION

I, Yemin Ji declare that I have reviewed the Shareholder Derivative Complaint ("Complaint") prepared on behalf of KVH Industries, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of KVH Industries, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

6/04
Date

Yemin Ji

DATED: June 20, 2005

Respectfully Submitted,

Peter N. Wasylyk
**LAW OFFICES OF**
**PETER N. WASYLYK**
1307 Chalkstone Avenue
Providence, RI 02908
Phone: (401) 831-7730
Fax: (401) 861-6064

William B. Federman
**FEDERMAN & SHERWOOD**
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Phone: (405) 235-1560
Fax: (405) 239-2112

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| YEMIN JI, derivatively on behalf of Nominal Defendant, KVH INDUSTRIES, INC., Plaintiff, v. MARTIN A. KITS VAN HEYNINGEN, PATRICK J. SPRATT, ROBERT W.B. KITS VAN HEYNINGEN, ARENT H. KITS VAN HEYNINGEN, MARK S. AIN, STANLEY K. HONEY, BRUCE J. RYAN, and CHARLES R. TRIMBLE, Defendants, and KVH INDUSTRIES, INC., Nominal Defendant. | Case No. CA 05 273T **PLAINTIFF'S CERTIFICATE OF FINANCIALLY INTERESTED PARTIES** **JURY TRIAL DEMANDED** |

**PLAINTIFF'S CERTIFICATE OF FINANCIALLY INTERESTED PARTIES**

To The Honorable United States District Court:

In compliance with Rule 3.1(f), Plaintiff, Yemin Ji, derivatively on behalf of Nominal Defendant, KVH Industries, Inc., identifies the following as persons or entities who may be financially interested in the outcome of this litigation:

1. Plaintiff, Yemin Ji, derivatively on behalf of Nominal Defendant KVH Industries, Inc.;

2. Martin A. Kits Van Heyningen;

3. Patrick J. Spratt;

4. Robert W. B. Kits Van Heyningen;



C:\Documents and Settings\Peter Wasylyk\My Documents\CertInterestedParties.doc

5. Arent H. Kits Van Heyningen;

6. Mark S. Ain;

7. Stanley K. Honey;

8. Bruce J. Ryan;

9. Charles R. Trimble;

10. KVH Industries, Inc.;

11. All counsel of record; and

12. There could be one or more insurance carriers interested; however such information would presently be in the possession of the Defendants.

Date: June 20, 2005.

Respectfully Submitted,

Peter N. Wasylyk
**LAW OFFICES OF**
**PETER N. WASYLYK**
1307 Chalkstone Avenue
Providence RI 02908
Phone: (401) 831-7730
Fax: (401) 861-6064

and

William B. Federman
FEDERMAN & SHERWOOD
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/FAX: (405) 235-2112
wfederman@aol.com

***Attorneys for Plaintiff***