**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| YEMIN JI, derivatively on behalf of Nominal Defendant, KVH INDUSTRIES, INC., | Case No. CA-05-273-ML |
| Plaintiff, | |
| v. | |
| MARTIN A. KITS VAN HEYNINGEN, PATRICK J. SPRATT, ROBERT W.B. KITS VAN HEYNINGEN, ARENT H. KITS VAN HEYNINGEN, MARK S. AIN, STANLEY K. HONEY, BRUCE J. RYAN AND CHARLES R. TRIMBLE, | |
| Defendants, | |
| and | |
| KVH INDUSTRIES, INC., | |
| Nominal Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, Yemin Ji hereby objects to the motion to dismiss of Defendants. In support of its objection, Yemin Ji relies on the memorandum of law submitted herewith.

Yemin Ji
By his Attorney,

Peter N. Wasylyk (RI Bar # 3351)
**LAW OFFICES OF**
**PETER N. WASYLYK**
1307 Chalkstone Avenue
Providence, RI 02908

Phone: (401) 831-7730
Fax: (401) 861-6064

- and -

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone: (405) 235-1560
Fax: (405) 239-2112
wfederman@aol.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2006, a true and correct copy of the above and foregoing instrument was mailed with sufficient postage prepaid thereon, to:

Brandon F. White
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

*Attorneys for Defendants*

Brooks R. Magratten
VETTER & WHITE, INCORPORATED
20 Washington Place
Providence, RI 02903

*Attorneys for Defendants*

Peter N. Wasylyk

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| YEMIN JI, derivatively on behalf of Nominal Defendant, KVH INDUSTRIES, INC., | Case No. CA-05-273-ML |
| Plaintiff, | |
| v. | |
| MARTIN A. KITS VAN HEYNINGEN, PATRICK J. SPRATT, ROBERT W.B. KITS VAN HEYNINGEN, ARENT H. KITS VAN HEYNINGEN, MARK S. AIN, STANLEY K. HONEY, BRUCE J. RYAN AND CHARLES R. TRIMBLE, | |
| Defendants, | |
| and | |
| KVH INDUSTRIES, INC., | |
| Nominal Defendant. | |

**PLAINTIFF'S MEMORANDUM IN RESPONSE AND OBJECTION TO DEFENDANTS' MOTION TO DISMISS VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Yemin Ji ("Ji" or "Plaintiff") responds and objects to Defendants Martin A. Kits Van Heyningen ("M. Kits Van Heyningen"), Patrick J. Spratt ("Spratt"), Robert W. B. Kits Van Heyningen ("R. Kits Van Heyningen"), Arent H. Kits Van Heyningen ("A. Kits Van Heyningen"), Mark S. Ain ("Ain"), Stanley K. Honey ("Honey"), Bruce J. Ryan ("Ryan"), and Charles R. Trimble's ("Trimble") (collectively the "Individual Defendants") and KVH Industries, Inc.'s ("KVH" or the "Company") (collectively the "Defendants") Motion to Dismiss Verified Shareholder Derivative Complaint. Defendants' Motion should be denied. Plaintiff is not collaterally estopped from asserting demand futility based on the allegations of the Verified Shareholder Derivative Complaint. The dismissal in the *Mehrvar* case was without prejudice, *i.e.*, not final, and its proceedings and orders therein are null and void and leave the parties in the same position as if the case had never been filed. Moreover, Plaintiff has alleged and can allege additional particularized facts not alleged in the *Mehrvar* Complaint. Finally, Plaintiff has alleged that demand upon KVH's Board of Directors to bring this action would be futile in that a majority of the KVH Board members faces a substantial likelihood of liability for the wrongdoing alleged in this lawsuit - - and therefore is not disinterested - - and/or is not independent of Board members who face a substantial likelihood of liability.

## I. <u>FACTUAL ALLEGATIONS</u>

### A. Parties

Plaintiff Ji is a KVH shareholder. Verified Shareholder Derivative Complaint ("Complaint") at ¶¶6, 74. Nominal Defendant KVH is incorporated in the State of Delaware. *Id.* at ¶7.

M. Kits Van Heyningen is a founder of the Company and has served as the Company's President since 1982 and its Chief Executive Officer ("CEO") since 1990. *Id.* at ¶¶8, 77. He has served as a director of the Company since 1982. *Id.* Defendant R. Kits Van Heyningen is a founder of the Company and has served as its Vice President of Research and Development since 1998. *Id.* at ¶¶10, 78. Defendant A. Kits Van Heyningen is a founder of the Company and has served as its Chief Scientist and Chairman of its Board of Directors since 1982. *Id.* at ¶¶11, 76. A. Kits Van Heyningen is the father of M. Kits Van Heyningen and R. Kits Van Heyningen. *Id.* at ¶76. The Kits Van Heyningens are considered by the Company to be insiders and not independent directors of the Company. *Id.* at ¶¶76-78. Together Defendants A. Kits Van Heyningen and M. Kits Van Heyningen are the beneficial owners of 6.9% of the Company's common stock. *Id.* at ¶83(d).

Defendant Honey has served as Director of the Company since 1997. *Id.* at ¶¶13, 80. Defendant Ain has served as a Director of the Company since 1997. *Id.* at ¶¶12, 79. Defendant Ryan has served as a Director of Company since July 2003. *Id.* at ¶¶14, 81. Defendant Trimble has served as a Director of the Company since 1999. *Id.* at ¶¶15, 82. Defendants Ain, Ryan and Trimble were members of the Audit Committee of the Company's Board of Directors during the relevant period. *Id.* at ¶¶12, 14-15, 83(n). Defendant Spratt was at all relevant times the Company's Chief Financial Officer ("CFO"). *Id.* at ¶9.

At the time this lawsuit was filed, the Company's Board of Directors consisted of seven (7) members - - Defendants M. Kits Van Heyningen, R. Kits Van Heyningen, A. Kits Van Heyningen, Ain, Ryan, Trimble and Honey. *Id.* at ¶75.

**B. Background**

KVH is a designer, manufacturer and marketer of mobile satellite communications products for the automotive/recreational vehicle/marine markets, tactical navigation, guidance and stabilization products for defense markets, and fiber optic products. *Id.* at ¶29.

Prior to the start of the Relevant Period, KVH experienced significant declines in the sales of its purportedly high margin navigation products to the defense sector. *Id.* at ¶30. The Company's future prospects were further eroded by unforeseen delays in obtaining requisite approvals and purchasing commitments for certain of KVH's defense related products from appropriate military authorities. *Id.* As a result, in September of 2003, KVH heavily promoted and rushed to market TracVision A5 ("A5") and G8 satellite TV ("G8") systems (collectively referred to as the "TracVision systems"), satellite communication devices that are designed for use in the automotive and marine markets. *Id.* at ¶¶30, 40. The TracVision systems, specifically the A5, allow users to watch satellite television from their vehicles. *Id.* at ¶30. KVH's introduction of the A5 came during an opportune period of "tremendous popularity" with "the backseat video entertainment market." *Id.* Defendants rode on the coattails of this popularity momentum to promote the A5 and its anticipated launch in the second quarter of 2003. *Id.* at ¶31.

Defendants' laudatory statements concerning A5 prompted market analysts to take a closer look at the A5 and its prospective impact on the Company's financials. *Id.* at ¶32. Indeed, a January 8, 2003 market report by Needham & Company, Inc. advised that, based on market statistics, sales of A5 could more than double KVH's reported

revenue for fiscal year 2002 from all sources. *Id.* at ¶32. After much self-perpetuated hype throughout the first and second quarters of 2003, KVH delayed its launch of the A5 from the second quarter 2003 until the third quarter of 2003. *Id.* at ¶33. By this time the Defendants' promotion of the A5 had caused a 113% appreciation in KVH's share price since the Company's January 9, 2003 press release introducing the A5 to the public. *Id.* at ¶33.

**C. The Defendants' Wrongful Conduct**

In order to perpetuate the appreciation of the Company's stock during the third quarter of 2003, the Defendants disseminated false and misleading information pertaining to the A5 which ultimately resulted in the price of KVH's shares reaching a Relevant Period high of $33.00 on November 25, 2003. *Id.* at ¶33.

Unknown to the public, however, KVH's TracVision systems had been rushed to market in order to stem the Company's financial losses in the defense sector. *Id.* at ¶34. The TracVision systems marketed by the Company during the Relevant Period could not be produced in quantities nor at cost levels that supported the Company's statements concerning KVH's return to profitability and sustainable growth during fiscal year 2004. *Id.* at ¶34. Thus, in order to reach KVH's proclaimed goals, Defendants caused KVH to artificially inflate its financial results by manipulating its sales numbers. *Id.* at ¶34.

The Individual Defendants used various sales and accounting tactics and inducements to carry out their plan. *Id.* at ¶35. In fact, unbeknownst to the public, 17% of the 1,700 A5 units sold by KVH in the fourth quarter of 2003 were returned to KVH early during the first quarter of 2004, because the customer had never actually ordered

the products. *Id.* at ¶54. Indeed during this time frame, there were often no purchase orders, only verbal orders and an undisclosed agreement as to sales terms. *Id.* at ¶54.

The Individual Defendants caused KVH to improperly recognize revenue from fictitious sales of the A5. *Id.* at ¶35. Specifically, at the end of each quarter during the relevant period, verbal purchase orders, as opposed to legally executed written purchase orders, were placed for any remaining warehouse inventory. *Id.* at ¶35. Upon receipt of these orders, the purported customers refused delivery and the "sold" products were returned. *Id.* at ¶35. During the fourth quarter of 2003, multiple truckloads of product were shipped to customers who refused to take delivery and subsequently returned the product. *Id.* at ¶54. The returned products sat for about six weeks in a trailer before being returned to active inventory. *Id.* at ¶54. Typically, returned inventory would reenter the market within several days, but in these cases the Individual Defendants allowed longer periods in order to manipulate KVH's financials. *Id.* at ¶54. These purported shipping orders without formal purchase orders were quite common during the last week of a quarter. *Id.* at ¶54. This practice of reporting revenues from fictitious sales was widespread. An inventory count would be conducted at the end of each quarter, and later that day, there would be a corresponding "order" for the same amount of inventory on hand. *Id.* at ¶54. Trailers would either merely remove the contents from the warehouse and allow the product to sit in the warehouse yard, or the trailer would merely hold the product off premises. *Id.* at ¶54. For these reasons, the Company's and Individual Defendants' statements as to KVH's revenues for the fourth quarter of 2003 were misleading. *Id.* at ¶54. KVH's reported revenues

were grossly overstated as revenues from the fictitious sales should not have been recognized. *Id.* at ¶35.

The Individual Defendants also caused KVH to engage in aggressive sales practices, such as channel stuffing, as evidenced by the fact that a majority of KVH's sales occurred during the last weeks or days of a period. *Id.* at ¶36. To induce customers to heavily purchase KVH products during this critical window to ensure the Company's guidance would be met, the Individual Defendants engaged in certain side agreements, such as waiver of shipping costs which were normally paid by the customer, unconditional rights of return, lifting of credit restrictions on certain customers to permit shipment, overriding a credit hold, authorizing shipment by COD, *i.e.* cash-on-delivery, and permitting price concessions on retail channel inventory. *Id.* at ¶36. These side agreements were not reflected in either the Company's or its customers' records. *Id.* at ¶36.

The Individual Defendants and the Company also shipped large amounts of defective A5s to customers. Customers refused delivery of an estimated 90% of the initial A5s shipped during the period of the A5s' introduction into the market due to damage during shipment. *Id.* at ¶46. KVH, nevertheless, continued to ship the A5 units even knowing that they would likely be returned due to damages sustained during shipment. *Id.* at ¶46. Furthermore, multiple units of the A5 were recalled as they could not receive Direct TV satellite broadcast programming, and thus had to be reconfigured. *Id.* at ¶46. These units were subsequently sold as "new" even though they were reconfigured and used. *Id.* at ¶46.

These improper sales and accounting practices - - discussed in more detail in the amended securities class action complaint filed November 19, 2004 and the Court's August 12, 2005 Memorandum and Order denying defendants' motion to dismiss filed and entered, respectively, in the related securities class action lawsuit[1] - - reached a pinnacle during the initial launch of the A5 in the third and fourth quarters of 2003. *Id.* at ¶37. This is evidenced by KVH's increased shipping costs, which were often waived, which exceeded KVH's budget by at least $750,000.00 to $1,000,000.00 during this time period. *Id.* at ¶37.

As set forth below, neither the Company nor the Individual Defendants disclosed these adverse facts to the public and investors; instead they, among other things, announced and reported false financial results based on revenues improperly recognized from the Company's fraudulent sales and revenue recognition practices.

The Individual Defendants' motivation was to artificially inflate KVH's stock price to enable KVH to carry out a public offering of KVH common stock to raise much needed capital. *Id.* at ¶38. It worked. On or about February 13, 2004, the Company issued over 2.7 million shares of KVH common stock at a price of $18.75 per share, generating more than $51.5 million in proceeds. *Id.* at ¶¶38, 54-55.

**D. Material Misstatements**

Throughout the relevant period, the Individual Defendants and the Company made numerous false and misleading statements concerning, among other things, the Company's financial results (i.e., revenues and earnings inflated by the Company's

---

[1] The Court can take judicial notice of the allegations in the amended complaint and the Court's findings in its Order denying Defendants' Motion to Dismiss in the related securities class action lawsuit (Case No. 04-CV-00306). In any event, the additional facts set forth therein can be alleged by Plaintiff upon amendment. *See* Section III, *infra.*

improper sales and revenue recognition practices) and the amount of A5 product the Company was shipping.

For instance, on October 1, 2003, KVH announced preliminary financial results for third quarter 2003, including that "overall third quarter revenues were up approximately 8% to $13.4 million." *Id.* at ¶40. Additionally in the press release, Defendant M. Kits Van Heyningen stated, "by the end of the quarter, we shipped approximately 150 TracVision A-5 units." *Id.* Thereafter, on October 16, 2003, KVH issued a press release reporting revenue for third quarter 2003 of $13.5 million, up 9% from $12.4 million for the third quarter ended September 30, 2002, net loss of ($0.16) million or ($0.01) per share. *Id.* In a conference call with analysts that same day, M. Kits Van Heyningen stated:

> By the end of Q3, we shipped approximately 150 A-5 systems. As of today, we can build them at a rate of about 250 per week. The production level that we're at now enables us to produce and ship our fourth quarter target of 2,000-3,000 [A-5] systems. We don't have any projection constraints.

*Id.* at ¶44. During the question and answer session of the call, M. Kits Van Heyningen further represented that KVH had "zero returns for product issues" and only some returns for "shipping damage," which was subsequently "addressed through better packaging." *Id.* at ¶45. He falsely described the shipping returns for damage as "less than 10 units" and further declared that "that's a non-issue now."[2] In its Form 10-Q filed with the SEC on November 14, 2003, and signed by Defendant Spratt, KVH reported the

---

[2] The factual allegations in this sentence are not contained in Plaintiff's Complaint, however, it is set forth in the amended complaint and the Court's Memorandum and Order filed August 12, 2005 denying Defendant's Motion to Dismiss in the related securities class action lawsuit. This allegation can be made by Plaintiff upon amendment.

same false financial results for the third quarter 2003 as those announced in the October 16, 2003 press release. *Id.* at ¶51. The Form 10-Q further misrepresented that the financial statements presented therein were prepared in conformity with GAAP. *Id.*

On January 6, 2004, KVH issued a press release reporting preliminary fourth quarter 2003 financial results, including record quarterly revenues of approximately $15.6-$15.9 million and a fourth quarter net loss in the range of $(0.11)-$(0.14) per share. *Id.* at ¶53. Commenting on the new TracVision A5 satellite TV system for automobiles, M. Kits van Heyningen stated,

> "The fourth quarter marked the first full quarter of TracVision A5 sales and shipments and during that period we shipped approximately 1,700 TracVision A5 units, which represents roughly 30% of our total estimated satellite communications revenue for the quarter. Already, the TracVision A5 satellite TV system for automobiles has proven to be the most successful product launch and fastest sales ramp of any product in the company's history."

*Id.* at ¶53.

In connection with the Company's February 13, 2005 public stock offering, KVH prepared and filed with the SEC a registration statement, signed by Defendants M. Kits Van Heyningen, Spratt, A. Kits Van Heyningen, R. Kits Van Heyningen, Ain, Honey, Ryan and Trimble and declared effective on or about February 10, 2004,[3] which incorporated a prospectus. *Id.* at ¶¶54-55. The Prospectus reported the Company's financial results for the period third quarter, including revenues of $41 million, net income of $154,792 and earnings per share of $.01.[4]

---

[3] Although the Complaint only alleged that Defendants M. Kits Van Heyningen and Spratt signed the Registration Statement, the other Defendants signed it as well and upon amendment Plaintiffs can allege same.

[4] This is not alleged in the Complaint, but can be upon amendment.

On February 19, 2004, KVH reported its financial results for the fourth quarter and year ended December 31, 2003, including revenue of $15.7 million, up 21% from $13.0 million for the fourth quarter ended December 31, 2003, and net loss of $(1.6) million, or $(0.14) per share compared to net income of $0.3 million, or $0.03 per share, during the same period last year. *Id.* at ¶56. In the press release announcing same, Defendant M. Kits Van Heyningen commented on the Company's operations:

> "In addition to 50% growth in the marine and RV markets, we also experienced a very positive introduction of the TracVision A5 into the automotive marketplace as we shipped approximately 1,700 units by the end of the year," continued Mr. Kits van Heyningen. "We fulfilled the channel backlog that had grown during the first three quarters of 2003 in anticipation of the TracVision A5 introduction.

*Id.* at ¶56.

The Form 10-K for fiscal year 2003 filed with the SEC on March 15, 2004, and signed by Defendants M. Kits Van Heyningen, R. Kits Van Heyningen, A. Kits Van Heyningen, Ain, Trimble, Honey and Ryan, contained the Company's previously announced false and misleading financial results for fourth quarter and year ending 2003. *Id.* at ¶57.

Finally, on April 22, 2004, KVH reported its financial results for the first quarter ended March 31, 2004, including revenue of $18.0 million, up 37% from $13.1 million for the quarter ended March 31, 2003, net income of $0.1 million, or $0.01 per share compared to net income of $0.2 million, or $0.02 per share, during the same period of the previous year. *Id.* at ¶58. Defendants M. Kits van Heyningen commented on the Company's purported return to profitability:

> "We're off to a strong start this year with excellent growth in our satellite communications business, which helped us post quarterly revenues that broke our previous record by more

> than $2 million. We also executed a $1.75 million sequential improvement on the bottom line as we achieved our immediate objective of returning to profitability," said Martin Kits van Heyningen, KVH's president and chief executive officer.

*Id.* at ¶58.

**E. The Truth is Revealed**

On July 6, 2004, prior to the market's opening, KVH's problems became known to the public when the Company issued a press release announcing its preliminary second quarter of 2004 financial results. *Id.* at ¶59. KVH reported that its revenues had significantly declined, both sequentially and when compared to the same period the previous year. *Id.* at ¶59. The Company reported that it expected second quarter revenues to be $14.2 million to $14.5 million, a decline of more than 19% compared to the first quarter. *Id.* At ¶59. Moreover, the Company revealed that KVH was being forced to slash the price of its TracVision systems by more than 34% and write-down channel and stock inventories of the systems by at least $2.5 million. *Id.* at ¶59. As a result the Company was expected to report a loss for the second quarter of 2004 of at least $(4.9) million or $(0.34) per share. *Id.* at ¶59.

The market reacted negatively to Defendants' belated disclosures. *Id.* at ¶60. On July 6, 2004, the price of KVH common shares fell more than 24%, opening at $9.51 per share, off nearly $3.00 per share form the previous close of $12.50 per share on July 2, 2004, a 49% decline from the public offering price of $18.75 just 4 months earlier, and a more than 70% decline from the Relevant Period high of $33. *Id.*

In a July 6, 2004 press release, Spratt attributed the Company's drop in revenue to "lower than expected sales for [KVH's] military navigation products and land mobile

satellite systems. . . ." *Id.* at ¶59. M. Kits Van Heyningen later stated that the Company's disappointing financial results were due to "an unusual convergence of factors [including] a channel inventory adjustment by one of KVH's major RV customers, potential key military programs where purchasing decisions have been delayed, and fiber optic orders that were rescheduled for the third quarter rather than the second." *Id.* at ¶61. KVH's satellite product revenue continued to suffer declines in the third quarter of 2004 falling more than 17% from the second quarter figures to a total of $10.3 million. *See id.* at ¶63.

### F. Defendants R. Kits Van Heyningen and Trimble's Illegal Insider Stock Sales

On November 10, 2003, Defendant Trimble sold 5,000 KVH shares at $28.70 per share for proceeds of $143,500. *Id.* at ¶69. Thereafter, on November 17, 2003 Defendant R. Kits Van Heyningen sold 17,326 KVH shares at $29.00 per share for proceeds of $503,219.06. *Id.* at ¶69. These stock sales occurred during the fourth quarter of 2003 at the peak of the Individual Defendants' improper actions concerning TracVision systems and with the price of KVH shares artificially inflated by the false and misleading statements disseminated by the Defendants to the public. *Id.* at ¶70. In the year preceding his KVH stock sales, Trimble did not make any sales of KVH shares. *Id.* R. Kits Van Heyningen had only previously sold KVH shares in December 2002 and June 2003. *Id.*

### G. The Class Action Lawsuits

Following the Company's negative revelations concerning its true business prospects, numerous securities class action lawsuits were filed. These lawsuits named as defendants, the Company, M. Kits Van Heyningen and Spratt. After consolidation of

these cases (Case No. 04-CV-00306), the Company, M. Kits Van Heyningen and Spratt filed a Motion to Dismiss. These defendants asserted that plaintiffs had failed to meet the stringent pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). The Court disagreed and denied the defendants' motion.

The Court found, among other things, that the numerous sources cited by the securities class action plaintiffs "provide consistent accounts of particular fraudulent practices; . . . three of the four sources recount the shipment of two or three truckloads of unordered A5 units at the end of the fourth quarter of 2003 and two of them recall that KVH shipped defective A5 units." Memorandum and Order at 13. The Court further noted that the alleged fraudulent practices were described by the confidential sources with a "degree of specificity."

> For example, the former shipping and receiving clerk explicitly names a KVH executive, Bruce Costa, who is alleged to have created orders for products remaining in inventory at the very end of each quarter. This clerk also names ABF Freight Systems as the particular freight carrier that would haul offsite the trailers containing this leftover inventory. The former shipping manager provides a relatively specific amount ($750,000 to $1,000,000) by which KVH shipping costs exceeded budgeted amounts for 2004. Three sources recount one specific incident at the end of the fourth quarter of 2003 where two or three truckloads of A-5 units were shipped without having been ordered.

*Id.* at 13-14.

The Court concluded that plaintiffs had alleged fraud with particularity as required under Rule 9(b), Fed. R. Civ. P., and a strong inference of scienter. In particular, the Court found, among other things, that the plaintiffs had alleged materially misleading statements in KVH's Form 10-Q filings for November 14, 2003 and May 7, 2004, its Form S-3 Registration Statement and Prospectus for the secondary offering and its

March 15, 2004 Form 10-K for the 2003 fiscal year. *Id.* at 16. The Court stated that "Defendants SEC filings are alleged to violate GAAP because of bookkeeping inaccuracies that result from **systemic fraud**, such as the purported fictitious sales and channel stuffing activities, including the undisclosed waiver of shipping costs, the granting of unconditional rights of return, and the lifting of credit restrictions. Plaintiffs maintain that these irregularities inflated KVH's revenue by a significant degree; the fictitious sales at the end of the fourth quarter of 2003 alone would have constituted 17% of A-5 sales that quarter." *Id.* at 16-17 (emphasis added).

The Court further found that the Company's and the Individual Defendants' statements in press releases and conference calls with analysts reporting the Company's earnings or the number of A-5 units shipped during the particular time span were also false and misleading:

> The fictitious sales and channel stuffing activities purportedly committed by Defendants rendered both categories of statements materially misleading. If, as is described in such detail in the Complaint, Defendants shipped A-5's to customers who had not ordered them and correspondingly reported such sales in KVH's financial statements, KVH's earnings and shipping figures for the particular periods in which these acts occurred would be falsely enlarged to a significant degree. Defendants alleged shipments of damaged, reconfigured A-5 units would further artificially inflate these figures.

*Id.* at 18-19.

Finding that the strong inference of scienter requirement had been met under the PSLRA, the Court stated:

> According to the complaint, Defendants allegedly shipped A5 units to customers who had not ordered them, parked goods in trailers that sat in the KVH yard, waived shipping costs without accounting for such waivers in KVH's records

> and accounting statements, granted unconditional rights of return in violation of KVH's stated return policy, lifted credit restrictions on customers in order to authorize delivery of A5 units, and provided customers with A5 units that had been assigned "Hold" designations by the quality assurance department. **These acts, taken together, certainly suggest large-scale fraud. The complaint's allegation that a KVH executive, Bruce Costa, instigated fictitious sales on a regular basis, suggests that the Company's fraudulent practices were not limited to the low-level employees but rather reached the very top of its corporate hierarchy.** The complaint also alleges that KVH's reliance on the success of the A5 served as a strong motive for the purported fraud. . . . KVH invested $19.5 million in the research initiatives that created the A5, and one can infer that it sought to recoup its significant investment in this new technology. Add to this the fact that the Secondary Offering, from which Defendants raised $51.5 million, was timed to occur contemporaneously with the roll-out of the A5, and an inference of motive to issue the misleading statements becomes not only plausible but likely.

*Id.* at ¶28. (emphasis added).

By denying defendants' motion to dismiss, the Court let stand claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5 and Sections 11, 12 and 15 of the Securities Act. *See id.* at ¶¶31-32. It is now clear that as a result of the Individual Defendants' wrongful conduct, the Company faces a strong likelihood of being held liable for securities fraud. The Company now faces the prospect of paying millions of dollars to settle or satisfy a judgment in the securities class action lawsuits and millions more to defend such lawsuits on top of what it has already been spent.

### H. The Defendant Directors Abdicated Their Oversight Responsibilities to the Company

It is apparent that the type of "large scale," indeed "systemic fraud" "reach[ing] the very top of its [KVH's] corporate hierarchy," that the Court found the securities class

action plaintiffs to have alleged and that is similarly alleged here, could not have occurred without the Defendant Directors' knowledge unless effective internal accounting and financial controls were completely lacking. The duties to design and implement effective financial and accounting controls are those of management and the Board of Directors, but in particular its Audit Committee. According to KVH's Proxy Statement filed with the SEC on April 22, 2004, Defendants Ain, Ryan and Trimble were, during the Relevant Period, members of the Audit Committee. *Id.* at ¶83(n). The Audit Committee members had the responsibility to monitor and review the financial reporting process, including the system of internal controls and the preparation of the Company's financial statements in accordance with GAAP. *Id.* According to KVH's charter for the Audit Committee in effect during the Relevant Period, the Audit Committee was charged with assisting the Board in overseeing the integrity of the Company's financial statements and the compliance with legal and regulatory requirements, among other things. *Id.*

## III. THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE ALLEGATIONS IN THE SECURITIES CLASS ACTION COMPLAINT AND FINDINGS IN THE COURT'S ORDER IN THE RELATED SECURITIES CLASS ACTION LAWSUIT

"It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." *Rodi v. Southern New England School of Law*, 389 F.3d 5, 19 (1st Cir. 2004). In such instances, the power of this Court to take judicial notice of other court proceedings, including previous litigation, is amply established by a multitude of cases. *See id.; see e.g.* Wright & Miller, 9 *Fed. Prac. & Proc. Civ. 2d,* § 2409. Moreover, "in appropriate circumstances [this Court] could take notice of the proceedings in other courts, both

within and without the federal judicial system." *See* Wright & Miller at §2409. In the present case, "a court may look to matters of public record in deciding a Rule 12(b)(6) motion.... *Boateng v. Interamerican University, Inc.,* 210 F.3d 56, 60 (1st Cir. 2000). The Court should take judicial notice of the factual allegations and the Court's findings on file in the related securities case, including the amended complaint and the Order denying defendants' motion to dismiss. In any event, the factual matters and findings set forth therein, to the extent they are not included in Plaintiff's Complaint, can be alleged by Plaintiff upon amendment.

## IV. THE DOCTRINE OF COLLATERAL ESTOPPEL IS INAPPLICABLE IN THIS CASE

Defendants contend that the state court's dismissal of the *Mehrvar* action without prejudice has preclusive effect on the Plaintiff's demand futility allegations in this case. This is simply incorrect.

When a federal court examines whether a state court decision has preclusive effect, the federal court must use the same law that a state court would employ in making such a determination. *Pascoag Reservoir and Dam, LLP v. Rhode Island*, 217 F.Supp. 2d 206, 213 (D. R.I. 2002) (citing *Texaco Puerto Rico, Inc. v. Medina*, 834 F.2d 242, 245 (1st Cir. 1987)), *aff'd*, 337 F.3d 87 (1st Cir. 2003), *cert. denied*, 540 U.S. 1090 (2003). The Rhode Island Supreme Court has adopted the following requirements for issue preclusion or collateral estoppel to apply: (1) that there must be an identity of issues, (2) that the prior proceeding resulted in a final judgment on the merits and (3) that the party against whom collateral estoppel is asserted is the same as or is in privity with the party in the prior proceeding. *Id.* at 214 (quoting *State v. Jenkins*, 673 A.2d 1094, 1096 (R.I. 1996)).

*Mehrvar*, relied upon by Defendants in support of their collateral estoppel argument, was dismissed without prejudice. The effect of this type of dismissal is to put the plaintiff in the same legal position as if he had never brought the first suit and to render the proceedings a nullity and leave the parties as if the action had never been brought. *Ochoa v. Union Camp Corp.*, 120 RI 898, 904, 391 A.2d 123, 126 (1978) (quoting *In re Piper Aircraft Distribution System Antitrust Litigation,* 551 F.2d 213, 219 (8th Cir. 1977)), *see also, M & D Cycles, Inc. v. American Honda Motor Company, Inc.*, 2002 WL 31236397 at *2 n.2 (D. N.H. Oct. 4, 2002) ("since those proceedings apparently ended in a dismissal without prejudice, the Board's determinations do not have preclusive effect."), *aff'd*, 70 Fed. Appx. 592 (1st Cir. 2003); *Pilots Point Marina, Inc. v. Cazzani Power Boat Manufacturing, Inc.*, 745 A.2d 782, 784 (R.I. 2000) (dismissal for lack of capacity to sue did not constitute a final judgment on the merits and did not preclude plaintiff from proceeding on its claim in the separate action). The complainant is thus not prejudiced, because he can bring a new action without bearing any extra burdens as a result of his first action. *Ochoa*, 391 A.2d at 126.

Indeed, the Court observed in an earlier order in this case:

> "A voluntary dismissal without prejudice results in a *tabula resa*. It renders the proceedings null and void and leaves the parties in the same position as if the action had never been prosecuted." *Jorge v. Rumsfeld*, 404 F.3d 556, 563 (1st Cir. 2005) (citing *Nat'l. R.R. Passenger Corp. v. Int'l. Ass'n. of Machinists*, 915 F.2d 43, 48 (1st Cir. 1990)). While the state action here [Mehrvar] was not voluntarily dismissed, it was nonetheless dismissed without prejudice, and the effect is the same . . . .

Memorandum and Order entered December 6, 2005. Also, as the First Circuit observed in *Nat'l. R.R. Passenger Corp. v. Int'l. Ass'n. of Machinists and Aerospace Workers*, 915

F.2d 43 (1st Cir. 1990), the effect of the "voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought." *Id.* at 48 (quoting *In re Piper Aircraft*, 551 F.2d at 219). This means that the dismissal carries down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues with respect to plaintiff's claim. *Id.* "In effect, then, the doctrines of collateral estoppel and *res judicata* are no longer available. . . ." *Id.*

Similarly, in *In re Piper Aircraft*, 551 F.2d 213, a case that has been relied upon by both the Rhode Island and First Circuit courts, the Court found that the plaintiff was not precluded from re-litigating the appropriateness of class certification although class certification had been denied in a previous federal court proceeding between the same parties. The Court based its decision on the fact that the previous action had been dismissed without prejudice. *Id.* at 218-21. The Court observed that the element of finality essential to application of collateral estoppel is plainly lacking in a judgment upon dismissal without prejudice. *Id.* at 220.

Collateral estoppel simply does not apply in this case; "dismissal without prejudice has, by definition, no preclusive effect." *Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 556 (7th Cir. 1986). Thus, because there was no final judgment on the merits, collateral estoppel does not apply. Furthermore, the allegations in the *Mehrvar* case and the present case are not identical, and in any event Plaintiff can, as set forth herein, allege additional facts not alleged in the *Mehrvar*. For this reason, too, collateral estoppel is not applicable.

## V. PLAINTIFFS HAS ALLEGED FACTS SUFFICIENT TO DEMONSTRATE DEMAND FUTILITY

In the present case the determination of whether Plaintiff has sufficiently alleged demand futility is determined under the test set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). Under the *Rales v. Blasband* test:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

*Id.* at 934.

Pleading futility of demand is not nearly as difficult as Defendants pretend.[5] Although a plaintiff is held to a particularized standard of pleading, plaintiff need not plead evidence. *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991). Instead, the factual allegations of the complaint must be accepted as true and need only raise a "reasonable doubt" as to the directors' disinterestedness or independence. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984). The "reasonable doubt" standard is not a restrictive evidentiary test. Plaintiffs are not required to plead particularized facts sufficient to sustain a "judicial finding" that the test excusing demand is satisfied.

---

[5] In fact, "recent Delaware decisions suggest a trend toward stricter judicial scrutiny of director decision-making." Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*, 29 J.Corp.L. 625, 645 (Spring 2004). "Delaware's most recent corporate decisions depart dramatically from the tradition of management deference that preceded Enron." *Id.* at 654. "Since Enron, Delaware law has taken a decidedly tougher stance with respect to director protections." A. Gilchrest Sparks, III, et. al., *Trends in the Delaware Law: Director Liability and Indemnification*, 1405 PLI/Corp. 331, 333 (Jan. 14, 2004). "Recent case law has tightened the definition of 'independent' and expanded the concept of 'good faith.'" *Id.* "Recent judicial decisions . . . indicate that the traditional safeguards of the business judgment rule, and charter provisions that eliminate personal liability for duty of care violations, will not protect directors that intentionally disregard their duties." Louis F. Herzeca and Ruke Ku, *Directors Take a Active Role, Courts and Regulators Heightening Scrutiny of Board Independence, Oversight*, 230 NYLJ 9 (Sept. 29, 2003).

*Grobow v. Perot,* 539 A.2d 180, 195 (Del. 1988). "Reasonable doubt can be said to mean that there is a reason to doubt. This concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule."); *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

Plaintiff's allegations go beyond notice pleading, and raise a reasonable doubt that a majority of KVH's seven member Board, at the time this lawsuit was filed, was disinterested and independent.

### A. Plaintiff has Alleged with Sufficient Particularity that there is a Reason to Doubt a Majority of the Board is Disinterested

Directorial interest may be said to exist when a director receives a personal financial benefit from a transaction which is not actually shared by the stockholders or "a corporate decision will have a materially detrimental impact on a director but not on the corporation and the stockholders." *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002); *Rales*, 634 A.2d at 936; *Rattner v. Bidzos,* 2003 WL 22284323 at *8-9 (Del. Sept. 30, 2003). A substantial likelihood of personal liability creates a disabling interest which prevents a director from impartially considering a demand. *Rattner,* 2003 WL 22284323 at *9; *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). In the present case, Plaintiffs have alleged with particularity facts demonstrating a majority of the members of KVH's Board of Directors face a substantial likelihood of personal liability for breaches of their fiduciary duties owed to KVH and its shareholders.

Directors of Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *In re Walt Disney Company Derivative Litigation*, 825 A.2d 275, 286 (Del. Ch. 2003). As alleged by Plaintiff, each of the Defendant Directors has breached one or more of these duties. For instance, Plaintiff has alleged with particularity that Defendants R. Kits Van Heyningen and Trimble breached their duties of loyalty and good faith to the Company through illegal insider trading and derived an improper personal benefit from such illegal sales.[6] *Brophy v. Cities Services Co.*, 70 A.2d 5, 7 (Del. Ch. 1949). Plaintiff has also alleged that each of the Director Defendants breached his duty of good faith by actively causing the Company to engage in securities fraud to the detriment of the Company and/or by abdicating his oversight duties to the Company and thereby permitting same.[7] The Defendant Directors face a substantial likelihood of liability for their wrongful conduct.

### 1. Each of the Defendant Directors Actively Engaged in Securities Fraud

Each of the Defendant Directors actually engaged in securities fraud to the detriment of the Company. They did so by, among other things, disseminating to the public false and misleading statements concerning the Company's earnings and

---

[6] Issues regarding the duty of loyalty arise in many contexts including insider trading. John L. Reid, Bruce N. Teles, Matthew M. Rosini, *Directors Liability for Y2K: A Corporate Governance Litigation Bear and A Securities Litigation Bull*, 24 Del. J. Corp. L. 835 (1999); *Oberly v. Kerby*, 592 A.2d 445, 463 (Del. 1991) ("it is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such a profit or advantage is not gained at the expense of the corporation.").

[7] Moreover, a director cannot act loyally towards the corporation unless he or she acts in good faith. *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

revenues and the number of A5 units shipped. *See e.g.*, Complaint at ¶¶34-36, 40, 44-46, 51, 53-54, 56-58. Each of the Defendant Directors signed reports filed with the SEC in which such materially false and misleading statements were made. *See, e.g., id.* at ¶57. Moreover, Defendant M. Kits Van Heyningen made numerous materially false and misleading statements in press releases and conference calls with analysts. *Id.* at ¶¶44-45, 53, 56, 58. This makes them liable. Defendants that sign SEC reports and other documents are liable for the material misstatements and omissions contained therein. *See In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001) ("by affixing his name to the Prospectus, [defendant] adopted the statements made therein and can be held liable for the alleged misrepresentations"); *see also Howard v. Eversex Sys., Inc.,* 228 F.3d 1057, 1061 (9th Cir. 2000) ("[w]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true"). It also excuses demand. *Fina v. Calarco Corp.*, 2005 WL 3112894, *7 (Conn. Super. 2005) (addressing demand futility allegations against directors under Delaware law). In *Fina*, the Court stated:

> While it can perhaps be argued allegations (c) is merely a conclusory allegation that the four (4) named directors had heightened responsibilities as members of the Audit Committee, it ignores the factually explicit assertion (in Paragraphs 113 and 127) that those same four (4) directors-as well as their other three (3) colleagues on the Board-signed off on the Form 10-Ks filed with the SEC. Surely the conscious decision to sign off on forms required to be filed with a federal investigative body was intended as a "vouching" for the accuracy and integrity of the information there provided and, if it is established at trial that that information was materially false and misleading, a bevy of remedies-both criminal and civil-are available to address that wrong. . . . The court concludes there is reasonable doubt

> these directors (all-as opposed to a mere majority) are disinterested and independent and there is, thus, reasonable doubt "that the protections of the business judgment rule are available" to them.

473 A.2d at 814. Moreover, Defendants M. Kits Van Heyningen is named as a Defendant in the securities class action lawsuit where the Court found that plaintiffs had alleged a strong inference that he had intentionally misled the public and investors.

**2. The Director Defendants Breached Their Duties of Good Faith to the Company by Abdicating their Oversight Responsibilities to the Company**

Under Delaware law "a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability." *In re Caremark International, Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (failure to oversee management has been upheld as a basis for implicating directors, particularly "outside" directors, in wrongdoing); *Canal Capital Corp. v. French*, 1992 WL 159008 at *3 (Del. Ch. Jul, 2, 1992) ("a director breaches his fiduciary duty of due care if he abdicates his managerial duties"); *Mills Acquisition Co. v. MacMillan, Inc.* 559 A.2d 1261, 1282 n.32 (Del. 1989) (board's virtual abandonment of oversight functions was breach of fundamental duties of loyalty and care). *In re Abbott Labs Deriv. Litig.*, 325 F.3d 795 (7th Cir. 2003) (same).

> Caremark instructs fiduciaries to prevent and address problems through compliance and monitoring programs. A sustained and utter failure to ensure the existence of a functioning program may well be grounds for a good-faith cause of action. Indeed, a failure to attempt to comply with one's fiduciary duties is likely to result in a breach of good faith.

Hillary A. Sale, *Delaware Good Faith*, 89 Cornell L. Rev. 456, 484 (Jan. 2004). "Complete abdication, whether intentional or deliberately indifferent, should result in

good faith liability." *Id.* at 489. Where a director consciously ignores his or her duties to the corporation thereby causing economic injury to its stockholders, the director's actions are either "not in good faith" or "involve intentional misconduct." *Disney*, 825 A.2d at 289.

In the present case, Plaintiffs have alleged "large scale," "systemic" fraud, Memorandum and Order at 16-17, 28, that clearly could not have occurred without the Director Defendants' knowledge in the absence of their failure to design and implement effective internal financial and accounting controls. The Company's Board of Directors clearly failed to implement effective internal financial and accounting controls over the Company's revenue recognition practices as is evidenced by the massive accounting fraud that is alleged to have been carried out on their watch. *See* Complaint at ¶35-38, 46, 54.

The importance of ensuring appropriate revenue practices cannot be overstated. As stated by Lynn E. Turner, Chief Accountant for the SEC, in a May 31, 2001 speech:

> Revenue is typically the single largest item reported in a company's financial statements. As with the all important bottom line and cash flows, companies' reported revenues are not only significant to these companies' financial statements in dollar terms, but also in the weight and importance that investors place on them in making investment decisions. Trends and growth in the top line of a company's income statement are barometers investors use when assessing the company's past performance and future prospects.
>
> The fundamental revenue recognition concept is that revenue should not be recognized by a company until realized or realizable and earned by the company. Consistent, rigorous application of this concept is an indispensable element of the U.S. financial reporting system. This concept is the foundation upon which the revenue recognition standards promulgated by the Financial

> Accounting Standards Board (FASB), the Accounting Standards Executive Committee (AcSEC), and the Emerging Issues Task Force (EITF) are based, and for the views expressed by the SEC staff in Staff Accounting Bulletin (SAB) 101.
>
> . . .
>
> Revenue recognition is an issue that surfaces in a significant number of the commission's enforcement cases and is the largest single issue involved in restatements of financial statements. For example, a March 1999 report entitled "Fraudulent Financial Reporting: 1987-1997 an Analysis of U.S. Public Companies, Sponsored by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission (the COSO report), indicated that over half of financial reporting frauds in the study involved the overstatement of revenue. Recent enforcement cases, including those involving Sunbeam, which I'll touch on later, MicroStrategy, and Livent, just add to the long list of enforcement actions alleging improper revenue recognition. Based on research performed by my office, restatements for revenue recognition also result in larger drops in market capitalization than any other type of restatements.

Speech by SEC Staff: Revenue Recognition, Remarks by Lynn E. Turner, available at http://www.SAC.gov/news/speech/spch495.htm (emphasis added). Despite the importance to the Company of following appropriate revenue recognition practices, the Defendant Directors failed to implement controls necessary to reasonably assure same and that the Company's revenues were recognized when earned in compliance with GAAP. The result was the Company's accounting improprieties that have led to the securities class action lawsuits and exposed the Company to millions of dollars in liability for securities fraud. *Id.*

The conduct of Defendants Ryan, Trimble and Ain, each a member of the Audit Committee of the Company, and the Kits Van Heyningen Defendants, each management Directors, was particularly egregious. According to the Company's Audit

Committee Charter, the duties of the Audit Committee specifically included the responsibility to monitor and review the financial reporting process, including the system of internal controls and the preparation of the Company's financial statements in accordance with GAAP. Complaint at ¶80(n). These Defendants clearly failed to fulfill these duties.

In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors. *See Miller v. Schreyer*, 200 A.D.2d 492, 606 NYS 2D 642 (1st Dept. 1994), *aff'd*, 257 A.D.2d 358, 683 NYS2D 51, 55 (1st Dept. 1999) (applying Delaware law); *see, e.g.*, *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (Delaware law); *In re First Energy Shareholder Deriv. Litig.*, 320 F.Supp. 2d 621 (N.D. Ohio 2004); *Mehlenbacher v. Jitaru,* 04-CV-1118, slip op. at 7 (M.D. Fla. June 6, 2004) (allegations, among other things, of directors "completely abdicating their oversight responsibilities" was sufficient to demonstrate demand futility); *Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005) (demand excused where plaintiff alleged facts supporting claim that directors breached their duties to monitor affairs of corporation); *Abbott Labs*, 325 F.3d 795 (7th Cir. 2003) (applying Delaware standards); *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 123, 129 (D.N.J. 1999) (applying Delaware law); Disney, 825 A.2d 277 (finding allegations that CEO unilaterally made decision to hire close friend as president, that no draft employment agreements were presented to Board for review, that Board did not raise any questions concerning hiring, that no expert advised Board concerning

appropriateness of employment terms, and that final agreement was negotiated and signed without input from the board sufficiently alleged breach of directors' obligation to act in good faith such that demand was excused); *In re Storage Technology Corp. Sec. Litig.*, 804 F.Supp. 1368 (D. Colo. 1992) (demand futility sufficiently alleged under Delaware law).[8]

*In Oxford Health Plans*, 192 F.R.D. 111 (decided under Delaware law) shareholders of a managed health care plan provider brought suit against directors and officers of the company claiming a variety of breaches of fiduciary duties. The allegations included claims that the defendants: (a) failed to have in place sufficient financial controls and procedures to monitor the planned conversion of a new computer system; (b) failed to implement and enforce procedures to prevent the wholesale appropriation of the company's information by certain directors who were asserted to have engaged in insider trading of stock based on confidential company information; (c) knowingly or recklessly disseminated, or permitted to be disseminated misleading information to shareholders; and (d) allowed the company to engage in many improper

---

[8] *In Storage Technology*, 804 F.Supp. 1368 the Court stated:

> Felzen's allegations of the directors' disinterest and lack of independence exceed the Rule 8(a) notice pleading standards. Moreover, the board had a duty to oversee the management of Storage Technology. Felzen lists the supervisory duties the board assumed as Storage Technology's managing body. She alleges the board breached these duties by failing to ensure that correct material information was disclosed publicly. She also specifically alleges that the board neglected its duty of preventing Storage Technology's officers and directors from misusing material, non-public information. Accepting Felzen's allegations as true, I conclude that she alleges with particularity a claim giving rise to director liability for breach of fiduciary duty and Rule 23.1 reasons why she made no effort to have the board institute her action.

*Id.* at 1376.

billing practices and to violate numerous insurance regulations thereby subjecting the company to fines, penalties and investigations. *Id.* at 114. The court assessed whether the plaintiff's complaint alleged with particularity conduct which, if proven, would establish the liability of the defendants under the *Caremark* standard. The court noted that under *Caremark* a director or officer can be liable based on nonfeasance when the director or officer engaged in "a sustained or systematic failure to exercise oversight and assure accurate record keeping." *Id.* at 117. The court held that the above allegations, if proven, would establish the failure of the defendants "in supervising or monitoring the affairs of the company." *Id.* Because, the court found, such proof would be sufficient to establish liability under the *Caremark* standard, demand was excused. *Id.*

Similarly, in *In FirstEnergy*, 320 F.Supp.2d 621, plaintiffs brought a derivative action against certain officers and directors of FirstEnergy alleging breaches of fiduciary duties by certain of its officers and directors, including that poor management led to serious problems at one of the Company's nuclear power plants (the blackout of August 14, 2003) and the company's restatement of its financial statements. *Id.* at 622. The court denied the defendants' demand futility based motion to dismiss. The court found that specific allegations in the complaint rendered the defendants' characterization of the complaint as "mere general allegations of wrongdoing" unpersuasive. *Id.* at 624. Among other things, the Court found plaintiffs had alleged specifically that the "directors failed to implement and maintain adequate internal financial accounting control systems for the company and that such failure of oversight resulted in the company's restatement." *Id.*

The conduct of the Defendant Directors alleged in the present case is similar to the conduct of the directors in the above-cited cases and the result reached by the Court should be the same. As noted by legal commentators:

> the Court's analysis in *Oxford Health Plans* identifies the type of sustained inattention to compliance monitoring and controls systems that will probably be sufficient to support director and officer liability under *Caremark* in a variety of contexts. Officers and directors will probably bear liability for corporate losses stemming from misconduct where (1) the misconduct involved a common area of compliance risk . . . in the company or industry in question and (2) monitoring and supervision systems to prevent the misconduct were not initiated by the officers or directors, (3) misconduct of significant magnitude and duration resulted, and (4) the misconduct went undiscovered by the officers and directors.

Louis M. Brown, Anne O. Candel, Richard S. Gruner, *The Legal Audit: Corporate Internal Investigation*, §7:4 and n. 15.

In short, Plaintiff has alleged, with particularity, that Defendants failed in their most basic duties as directors. "[R]egardless of his motive a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes." *Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000). Plaintiff has clearly alleged particularized facts sufficient to demonstrate, if proven true, that at least a majority of KVH's Directors, at the time this lawsuit was filed, breached their fiduciary duties to the Company by a sustained failure to implement effective internal financial controls and face a substantial likelihood of liability for same. Accordingly, Plaintiff has alleged that there is reason to doubt that a majority of the Board is disinterested and demand is excused.

### 3. Defendants R. Kits Van Heyningen and Trimble Breached Their Fiduciary Duties of Loyalty by Engaging in Insider Trading During the Relevant Period

Plaintiff has alleged that Defendants Trimble and R. Kits Van Heyningen are directly interested in the insider trading transactions challenged in the Complaint because each of them received a personal benefit from those transactions, Complaint at ¶¶50, 52, 69, and that each also faces a substantial likelihood of liability for engaging in these illegal transactions.

To adequately allege that a director is "interested" in an insider trading claim under Delaware law, Plaintiffs need only plead facts which support the inference "that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." *Zimmerman v. Braddock*, 2005 WL 2266566 at *8 (Del. Ch. Sept. 8, 2005). Such allegations are sufficient where the Complaint alleges "directly" or by "imputation" that the directors had knowledge of the material information and made their trades on that basis. *Id.* Plaintiff has accomplished this by his allegations in the Complaint concerning Defendants Trimble and M. Kits Van Heyningen.

Defendants R. Kits Van Heyningen is a founder of the Company, its Chairman and one of its highest ranking officers. Complaint at ¶¶10, 78. Trimble is a member of the Audit Committee. *Id.* at ¶83(n). Each signed SEC filed reports that were issued throughout the Relevant Period in which the Company's financial condition was misrepresented. *Id.* at ¶57. Moreover, A5 was the Company's leading product and the Company's success in selling such product was of considerable importance to the prospects of its business operations. Disclosures concerning matters of considerable

importance to the company or at the core of its operations support a strong inference that the senior most executives of the Company knew such disclosures were false or misleading. *In re Campbell Soup Co., Sec. Litig.*, 145 F.Supp. 2d 574, 599 (D. N.J. 2001) ("knowledge may be imputed to individual Defendants when the disclosures involve the Company's core business"); *In re Tele-Sav Sec. Litig.*, 1999 WL 999429 at *5 (E.D. Pa. Oct. 19, 1999); *In re Electronic Data Systems Corp. Securities and "Erisa" Litig.*, 298 F.Supp. 2d 544, 557 (E.D. Tex. 2004) ("Contract's sheer magnitude and importance to EDS support an inference that Brown and Daley, the CEO and CFO would know its status"); *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1100 (10th Cir. 2003) (fact that a person is the "most senior executive" of the Company is relevant in the scienter equation).[9] "[A]llegations that key officers and directors must have known misleading statements because the statements involved the Company's lead product candidate will satisfy the pleading requirements of scienter." *In re Vicuron Pharmaceuticals, Inc.*, 2005 WL 2989674 at *5-6 (E.D. Pa. July 1, 2005); *see also In re Genta In. Sec. Litig.*, 2005 WL 2416970 at *6 (D. N. J. Sept. 30, 2005) (citing cases) ("comprehensive knowledge of the clinical trials involved in the development of Genta's lead pharmaceutical product may be reasonably imputed to Warrell, who was President, Chairman and CEO of the Company").

Plaintiff has alleged facts from which it can be inferred that these Directors had knowledge, directly or by imputation, of the undisclosed information concerning the

---

[9] *See also In re Westell Technologies, Inc. Sec. Litig.*, 2001 WL 1313785 (N.D.Ill. Oct. 26, 2001); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Company's accounting practices. *See Zimmerman*, 2005 WL 2266566 at *8 n. 81 ("Paragraph 43 of the Second Amended Complaint alleges that the 'defendants' had access to Pricing Reports, Demographic Analyses, Network Operations Center Reports, and Promotion Reconciliation Reports. These reports are detailed enough information to reveal the difficulties Priceline faced."). *Id.* at *8. Moreover, the timing of the Defendants' stock sales was suspicious. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 67 (2d Cir. 2001); *No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98 (1st Cir. 1999). They occurred at a time when the Company was boasting to the public about the success of the A5 and its tock price at a near all time high. Complaint at ¶70. Trimble had not sold any Company shares within the preceding year. Insiders selling stock while disseminating positive information to the public is "like a ship's captain exiting in the safety of a lifeboat while assuring the passengers that all is well." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 67 (2nd Cir. 2001).

Thus Plaintiff has alleged reason to doubt that Defendants Trimble and M. Kits Van Heyningen are disinterested.

**B. Plaintiff has Alleged with Particularity that there is Reason to Doubt a Majority of KVH's Directors are Independent**

If a plaintiff pleads facts that create a reasonable doubt that a majority of the Board could have acted independently in responding to the demand the presumption of independence is rebutted for pleading purposes and demand will be excused as futile.

*Beam v. Stewart*, 845 A.2d at 1049.[10] The Delaware test for directorial independence "focuses on whether the directors, for *any substantial reason*, cannot act with only the best interests of the corporation in mind." *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 937-938 (Del Ch. 2003) (finding reason to doubt independence of special litigation committee, tenured professors at Stanford University, to investigate conduct of directors with ties to the University) (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001) (emphasis in original), *rev'd in part on other grounds*, 817 A.2d 149 (Del. 2002)). The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board rather than on extraneous considerations or influences. *Beam* at 1049. "That is the Supreme Court cases ultimately focus on impartiality and objectivity." *Oracle*, 824 A.2d at 938; *Beam*, 845 A.2d at 1049

A director may be compromised if he is beholden to or controlled by an interested person. *Oracle* 824 A.2d at 938; *Telxon Corp. v. Myerson*, 802 A.2d 257, 264 (Del. 2002). Beholden in this sense does not mean just owing in the personal financial sense, it can also flow out of "personal or other relationships" to the interested party. *Oracle*, 824 A.2d at 938-39. A controlled director is one who is dominated by another party through close personal or familial relationship or through force of will. *Telxon*, at 264. Independence of the board is a fact-specific determination made in the context of a particular case. *Beam*, 845 A.2d at 1049; *International Equity Capital Growth Fund, LP v. Clegg*, 1997 WL 208955 at *2 (Del.Ch. April 22, 1997). There are few bright lines.

---

[10] A director is compromised if he is either not disinterested or not independent.

*Clegg* at *2. In evaluating the impartiality and objectivity of the board, the court should employ a common sense application of those terms. *Parfi*, 794 A.2d at 1231.

Clearly, the Kit Van Heyningen Defendants who are father and sons or brothers, Complaint at ¶76, could not make an impartial and objective determination whether to sue one another. Furthermore, it cannot be credibly argued that there is no reason to doubt Defendant M. Kits Van Heyningen who faces a substantial likelihood of liability in the securities class action lawsuit (as well as in this lawsuit), is not disinterested. Moreover, Defendant R. Kits Van Heyningen is alleged to have engaged in insider trading. "'Reasonable doubt' is raised when an demand would require a director to support a suit contrary to the interests of a close family member. The logic of analogous authorities supports this conclusion." *Mizel v. Connely*, 1999 WL 550369 at *4 (Del. Ch. July 22, 1999); see also, *In re Cooper Company, Inc. Shareholders Derivative Litigation*, 2000 WL 1664167 at *6 (Del. Ch. Oct. 31, 2000) ("Similarly, the Complaint alleges that director Feghali was interested and/or lacked independence because he was Steven Singer's father-in-law. That family relationship is sufficient to create a reason to doubt Mr. Feghali's ability to impartially consider a demand").

Moreover, the remaining Directors are not independent of the Kits van Heyningens, the founders of the Company, who control the Board through their positions as Chairman of the Board, the Company's highest ranking officers and their 7% beneficial ownership of the Company's stock.

In cases such a this one where courts have found the majority of the board to not be independent either through current or past business, personal or employment relationships with each other demand is excused.[11]

## VI. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied. If the Court finds that Plaintiff's Complaint is deficient, any dismissal should be without prejudice and with leave to amend so that Plaintiff may attempt to cure any pleading deficiencies.

---

11 Although mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction. *See, e.g., In re Ply Gem Industries, Inc. Shareholders Litig.,* Del.Ch., C.A. No. 15779-NC, let. op. at 4, Noble, V.C., 2001 WL 1192206 (Sept. 28, 2001) (stating that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that director's] position with Ply Gem, *may establish an obligation or debt (a sense of 'owingness')* upon which a reasonable doubt as to a director's loyalty to a corporation may be premised") (emphasis added); *In re New Valley Corp. Derivative Litig.,* Del.Ch., C.A. No. 17649, mem. op. at 19, Chandler, C., 2001 WL 50212 (Jan. 11, 2001).

*Orman* 794 A.2d at 27 n.55.

Respectfully submitted,

Peter N. Wasylyk (RI Bar # 3351)
**LAW OFFICES OF**
**PETER N. WASYLYK**
1307 Chalkstone Avenue
Providence, RI 02908
Phone: (401) 831-7730
Fax: (401) 861-6064

- and -

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone: (405) 235-1560
Fax: (405) 239-2112
wfederman@aol.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2006, a true and correct copy of the above and foregoing instrument was mailed with sufficient postage prepaid thereon, to:

Brandon F. White
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

*Attorneys for Defendants*

Brooks R. Magratten
VETTER & WHITE, INCORPORATED
20 Washington Place
Providence, RI 02903

*Attorneys for Defendants*

Peter N. Wasylyk